**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Dorothy R. GARBER,**
**Defendant-Appellant.**

**No. 78–5024.**

United States Court of Appeals,
Fifth Circuit.

Nov. 19, 1979.

Samuel S. Forman, Hollywood, Fla., Lawrence R. Metsch, Stanley A. Beiley, Miami, Fla. (co-counsel), for defendant-appellant.

Marsha L. Lyons, Asst. U. S. Atty., Miami, Fla., Charles E. Brookhart, Daniel F.

Ross, Attys., Dept. of Justice, Tax Div., Washington, D.C., for plaintiff-appellee.

Before BROWN, Chief Judge, and COLEMAN, GOLDBERG, AINSWORTH, GODBOLD, CHARLES CLARK, RONEY, GEE, TJOFLAT, HILL, FAY, RUBIN, VANCE and KRAVITCH, Circuit Judges.*

CHARLES CLARK, Circuit Judge:

Dorothy Clark Garber was indicted for willfully and knowingly attempting to evade a portion of her income tax liability for the years 1970, 1971, and 1972 by filing a false and fraudulent income tax return on behalf of herself and her husband. A jury found her innocent of the charges for 1970 and 1971 but convicted her under 26 U.S. C.A. § 7201 for knowingly misstating her income on her 1972 tax return. She was sentenced to 18 months imprisonment—all but 60 days of which was suspended— placed on probation for 21 months, and fined $5,000 exclusive of any civil tax liability. The taxability of the money received by Garber presents a unique legal question. Because of trial errors which deprived defendant of her defense on the element of willfulness, we reverse the conviction.

Some time in the late 1960's after the birth of her third child, Dorothy Garber was told that her blood contained a rare antibody useful in the production of blood group typing serum. Dade Reagents, Inc. (Dade Reagents), a manufacturer of diagnostic reagents used in clinical laboratories and blood banks, had made the discovery and in 1967 induced her to enter into a contract for the sale of her blood plasma. By a technique called plasmapheresis, a pint of whole blood was extracted from her arm, plasma was centrifugally separated, and the red cells were returned to her body. The process was then repeated. The two bleeds

* Judges Frank M. Johnson, Jr., Garza, Henderson, Reavley, Politz, Hatchett, Anderson, Randall, Tate, Sam D. Johnson and Thomas A. Clark, did not participate in the consideration of or decision in this case. The case was taken under submission by the court en banc on June 5, 1979.

produced one pint of plasma from two pints of blood, and took a total of from one and a half to two and a half hours.

Plasmapheresis is often preceded by a stimulation of the donor whereby the titre or concentration of the desired antibody in the blood is artifically increased by an injection of an incompatible blood type. Both stimulation and plasmapheresis are accompanied by pain and discomfort and carry the risks of hepatitis and blood clotting.

In exchange for Garber's blood plasma, Dade Reagents agreed to pay her for each bleed on a sliding scale dependent on the titre or strength of the plasma obtained. Dade Reagents then marketed the substance for the production of blood group typing serum.

Because Garber's blood is so rare—she is one of only two or three known persons in the world with this antibody—she was approached by other laboratories which lured her away from Dade Reagents by offering an increasingly attractive price for her plasma. By 1970, 1971, and 1972, the three years covered in the indictment, she was receiving substantial sums of money in exchange for her plasma.[1] For two of those years she was selling her blood under separate contract to Associated Biologicals, Inc. (Associated) and to Biomedical Industries, Inc. (Biomedical), in both cases receiving in exchange a sum of money dependent on the strength of the antibody in each unit sold. In addition, Biomedical offered a weekly salary of $200, provided a leased automobile, and in 1972 added a $25,000 bonus. In that last year Garber sold her plasma to Biomedical exclusively, producing the coveted body fluid as often as six times a month.

For all three years involved, Biomedical had treated the regular $200 weekly payments as a salary subject to withholding taxes and provided Garber with a yearly W–2 form noting the taxes withheld. Every year, Garber attached those W–2 forms to her income tax return (which was filed jointly with her husband whom she has

since divorced), declared the $200 per week as income, and paid the taxes due. All other payments, both from Biomedical and from Associated, had been paid directly to defendant by check. No income taxes were withheld by the companies; she received no W–2 forms, and paid no taxes on the money received. Biomedical did, however, file a Form 1099 Information Return with the IRS which showed a portion of Garber's donor fees not subject to withholding. Garber was provided a copy of each 1099, which plainly states that it is for information only and is not to be attached to the income tax return. She had never before received Information Returns, and, while she was receiving checks from both Biomedical and Associated, only Biomedical provided this information.

██ In this prosecution for the felony of willful evasion of income taxes the government had the burden of proving every element of the crime beyond a reasonable doubt. *Holland v. United States*, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954); *United States v. England*, 347 F.2d 425 (7th Cir. 1965). This required proof of a tax deficiency, an affirmative act constituting evasion or attempted evasion of the tax due, and willfulness. *Sansone v. United States*, 380 U.S. 343, 85 S.Ct. 1004, 13 L.Ed.2d 882 (1965); *United States v. Callahan*, 588 F.2d 1078 (5th Cir. 1979); *United States v. Buckley*, 586 F.2d 498 (5th Cir. 1978). The element we find lacking here was willfulness.

At trial, outside the presence of the jury, the government proffered the testimony of Jacquin Bierman, a professor of law and practicing attorney in the City of New York, who stated his opinion that Garber had made available her bodily functions or products for a consideration which constituted taxable gross income. His conclusion was based on section 61(a) of the Internal Revenue Code (Code) which defines gross income as

---

1. Sale of her plasma allegedly brought her $80,200 in 1970, $71,400 in 1971, and $87,200 in 1972.

all income from whatever source derived, including (but not limited to) the following items:

(1) Compensation for services, including fees, commissions, and similar items;

. . . . . .

(3) Gains derived from dealings in property;

26 U.S.C.A. § 61(a). While admitting that this case is the first of its kind, Bierman opined that if the exchanges were considered the sale of a product, there would be no tax basis or original cost for the product sold, and the entire sales price would constitute gain subject to tax under section 61(a)(3). Alternatively, he considered categorizing the transactions as the rendition of a service, in which case he was of the opinion that the entire sales price similarly would be fully taxable under section 61(a)(1).

The defense proffered to the court the testimony of Daniel Nall, a Certified Public Accountant and former revenue agent, who concluded that the money received by Garber was not within the legal definition of income in section 61(a) and that she had therefore participated in tax-free exchanges. He patterned his reasoning on early case law resting on *Doyle v. Mitchell Brothers*, 247 U.S. 179, 38 S.Ct. 467, 62 L.Ed. 1054 (1918), which held that funds obtained by the conversion of capital assets and which represented only the actual value of such assets was not taxable income. According to Nall, the Attorney General in a 1918 opinion considered the human body a kind of capital asset. Following the reasoning in *Doyle*, the opinion held that the proceeds of an accident insurance policy were not subject to tax because the pro-

ceeds of the insurance policy represented a conversion of the capital loss which the injured taxpayer had suffered. Nall mentioned similar opinions finding settlements received for personal injury not taxable income. Eventually the Code was amended to include a specific provision covering the tax consequences of compensation for injuries or sickness.[2] Nevertheless, Nall explained, the theory has reappeared in situations involving the exchange of something so personal that its value is not susceptible to measurement. In these transactions—such as property settlements in divorce actions or damage awards for alienation of affection or for defamation of character—the value received is deemed equal to the value given, resulting in no taxable gain. Nall compared blood plasma, a part of the body which no one can value, and concluded that it too must be worth its market value. He therefore reasoned that its exchange produces no gain.

The district court heard the testimony of these two experts but refused to admit either opinion in the evidence which went to the jury because it considered the question of taxability to be one of law for the court and not the jury to decide. However, the court did permit the government to introduce testimony by an Internal Revenue Service agent who qualified as an expert in the field of accounting and taxation. This agent offered his opinion that additional taxable income was due but not reported in the years in question. His testimony was received over defense objection that it was based on his conclusion that the compensation received was income and taxable. During cross examination, the witness conceded that the taxability of money received

---

**2.** Section 104 of the Code, 26 U.S.C.A. § 104, now expressly excludes from taxable income certain insurance proceeds and

(2) the amount of any damages received (whether by suit or agreement) on account of personal injuries or sickness;

26 U.S.C.A. § 104(a)(2).

The defendant has alternatively argued that the payments here in question fall within this exclusion from taxable income. Section 104(a)(2) has consistently been applied only to

payments resulting from the settlement or prosecution of a tort claim. *Knuckles v. CIR*, 349 F.2d 610 (10th Cir. 1965); *Starrels v. CIR*, 304 F.2d 574 (9th Cir. 1962); *Agar v. CIR*, 290 F.2d 283 (2d Cir. 1961). The only evidence in the record which could possibly support a claim that the payments to Garber were in settlement of a tort liability were medical release of liability forms she signed. We express no opinion on the ultimate merits of this contention.

for giving up a part of one's body is a unique and undecided question in tax law. He also agreed that money received as a return on a capital product is not subject to tax. Yet, he based his calculations on his opinion that the blood plasma donations here were taxable personal services. His view was, in turn, based solely on a Revenue Ruling which declared donations of whole blood to be a service for purposes of determining the deductibility of a charitable contribution. The court sustained objections to the relevancy of further inquiry regarding the nature or value of blood plasma.

The defense argued to the court that the expert testimony of Daniel Nall should be presented to the jury to rebut the government's expert IRS agent, to show that doubt existed as to whether a tax was due because it was incapable of being computed, and to demonstrate the vagueness of the law, which would preclude a willful intent to violate it. The court recognized that Nall's theory could be relevant to its judicial resolution of the legal conflict. It ruled however that since Nall had never discussed his opinion of the law with the defendant, it had no relevancy to the fact issue of Garber's intent. The jury never heard the testimony. It did, however, hear considerable

factual evidence relating to Garber's actual intent.[3]

After hearing all the evidence, the court ruled as a matter of law that the moneys Garber received for her blood plasma, whether considered a personal service or a product, were income subject to federal income taxation. Consistent with that ruling the jury was instructed that the funds Garber received from the sale of her blood plasma were taxable income. The court also instructed the jury extensively on good faith and willfulness but refused the instructions requested by defense to the effect that a misunderstanding as to defendant's liability for the tax is a valid defense to the charge of income tax evasion, saying:

> I have said over and over again [to the jury] that she must act willfully, knowingly and willfully, in an effort to evade and defeat a tax by filing a false return, and that tells it all as far as I am concerned. This business about doubt and all these debatable things I have listened to around here for several days, and I'm not going to charge the jury that way, so as to confuse them. I think that would do more harm than good, and I think it would be error.

The defense offered affirmative evidence to show that Garber did not willfully misstate her income. An accountant had prepared all three joint returns from information supplied by Mr. Garber, who was not indicted, without consulting with defendant. Furthermore, it was undisputed that all payments to defendant were made by check, payable to her, and deposited in her bank account. Payments were never made in cash; there was no duplicative bookkeeping or other clandestine financial dealings indicative of an attempt to secrete earnings. Her returns for the years in question disclosed Biomedical as a source of income. In addition, Garber produced a copy of her 1969 tax return on which she declared no taxable income but noted "I have no W–2 forms as my income was made up entirely from donating blood plasma from various blood banks." The defendant herself testified that she thought, after speaking with other blood donors, that because she was selling a part of her body the money received was not taxable.

---

3. To prove that Garber had to have been actually aware of her tax liability, the government offered testimony from an employee of Dade Reagents, contradicted by defendant's own statements, that in Garber's early dealings with that company not only had she been advised of the taxable element of her payments but the company had also opened a savings account in her name and regularly deposited a portion of her earnings allegedly for income tax purposes. The IRS agent who first investigated the Garbers took the stand and testified that, in his initial interview with both Mr. and Mrs. Garber concerning their 1971 joint return, defendant denied having received any income other than the reported $200 per week salary from Biomedical. However, that same afternoon following the interview, defendant called the agent, explained that she and her husband were about to be divorced, and arranged a second interview in which she discussed her plasma donations and disclosed all monies received. The agent admitted that Garber was cooperative in the absence of her husband; she produced all relevant records including the 1099 forms received from Biomedical.

We hold that the combined effect of the trial court's evidentiary rulings excluding defendant's proffered expert testimony and its requested jury charge prejudicially deprived the defendant of a valid theory of her defense. No court has yet determined whether payments received by a donor of blood or blood components are taxable as income. If, as the government contends, by subjecting herself to the plasmapheresis process Garber has performed a service, her compensation would be taxable under section 61(a)(1) of the Code. In some ways, Garber's activity does resemble work: artificial stimulation, which is not a necessary prerequisite to plasma extraction, causes nausea and dizziness; the ordeal of plasmapheresis can be extremely painful if a nerve is struck, can cause nausea, blackouts, dizziness and scarring, and increases the risks of blood clotting and hepatitis. These efforts of production may logically compare to the performance of a service.

On the other hand, blood plasma, like a chicken's eggs, a sheep's wool, or like any salable part of the human body, is tangible property which in this case commanded a selling price dependent on its value. The amount of Garber's compensation for any given pint of plasma was directly related to the strength of the desired antibodies. The greater their concentration, the more she was paid; her earnings were in no way related to the amount of work done, pain incurred, or time spent producing one pint of plasma.

Of course, the product/service distinction is relevant only if the sale of the product results in no taxable gain. The experts testifying for both parties here concede that section 61(a)(3) includes in income only the profit gained through the sale or conversion of capital assets. They do not, however, agree on the computation of gain, because they differ in their theories as to how the value of the product before its sale is to be established. The cost of Garber's blood plasma, containing its rare antibody, cannot be mathematically computed by aggregating the market cost of its components such as salt and water. That would be equivalent to calculating the basis in a master artist's portrait by costing the canvas and paints. No evidence of any original cost exists in the case of Garber's unusual natural body fluid.

In such a situation it may well be that its value should be deemed equal to the price a willing buyer would pay a willing seller on the open market. *See United States v. Davis,* 370 U.S. 65, 82 S.Ct. 1190, 8 L.Ed.2d 335 (1962); *Bar L Ranch, Inc. v. Phinney,* 426 F.2d 995 (5th Cir. 1970); *Raytheon Production Corp. v. CIR,* 144 F.2d 110 (1st Cir.), *cert. denied,* 323 U.S. 779, 65 S.Ct. 192, 89 L.Ed. 622 (1944); *Farmers' & Merchants' Bank v. CIR,* 59 F.2d 912 (6th Cir. 1932). If this were the proper basis, the exchange would be a wash resulting in no tax consequences. However, we need not and do not undertake the complex task of resolving what the law should be, nor is it necessary to decide whether, as the trial court concluded, the question is purely one of law for the court and not the jury to resolve. Rather, because the district court refused to permit Bierman, the expert for the government, and Nall, the expert for the defense, to testify and because it reserved to itself the job of unriddling the tax law, thus completely obscuring from the jury the most important theory of Garber's defense—that she could not have willfully evaded a tax if there existed a reasonable doubt in the law that a tax was due—her trial was rendered fundamentally unfair.

A tax return is not criminally fraudulent simply because it is erroneous. Willfulness is an essential element of the crime charged. As such, the government must prove beyond a reasonable doubt that the defendant willfully and intentionally attempted to evade and defeat income taxes for each year in question by filing with the IRS tax returns which she knew were false. *United States v. Pomponio,* 429 U.S. 10, 97 S.Ct. 22, 50 L.Ed.2d 12 (1976); *United States v. Bishop,* 412 U.S. 346, 93 S.Ct. 2008, 36 L.Ed.2d 941 (1973). It is not enough to show merely that a lesser tax was paid than was due. Nor is a negligent, careless, or unintentional understatement of income

sufficient. *Holland v. United States,* 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 50 (1954); *United States v. Murdock,* 290 U.S. 389, 54 S.Ct. 223, 78 L.Ed. 381 (1933); *United States v. Pechenik,* 236 F.2d 844 (3d Cir. 1956). The government must demonstrate that the defendant willfully concealed and omitted from her return income which she knew was taxable.

 When the taxability of unreported income is problematical as a matter of law, the unresolved nature of the law is relevant to show that defendant may not have been aware of a tax liability or may have simply made an error in judgment. *Nordstrom v. United States,* 360 F.2d 734 (8th Cir.), *cert. denied,* 385 U.S. 826, 87 S.Ct. 59, 17 L.Ed.2d 63 (1966); *United States v. Bridell,* 180 F.Supp. 268 (N.D.Ill.1960). Furthermore, the relevance of a dispute in the law does not depend on whether the defendant actually knew of the conflict. In *United States v. Critzer,* 498 F.2d 1160 (4th Cir. 1974), the Fourth Circuit reversed a criminal tax fraud conviction against an Eastern Cherokee Indian who failed to report a portion of her income derived from land held by the United States in trust for the Eastern Cherokee Band. The evidence clearly established that the underreporting was intentional. Whether the income was taxable, however, was a disputed question dependent on the interpretation of certain land allotment statutes, which the court did not resolve. Instead, it reversed the conviction because of the absence of authority definitively governing the situation. The court's language is particularly apt here:

> As a matter of law, defendant cannot be guilty of willfully evading and defeating income taxes on income, the taxability of which is so uncertain that even co-ordinate branches of the United States Government plausibly reach directly opposing conclusions. As a matter of law, the requisite intent to evade and defeat income taxes is missing. *The obligation to pay is so problematical that defendant's actual intent is irrelevant. Even if she had consulted the law and sought to guide herself accordingly, she could have had no certainty as to what the law required.*

498 F.2d at 1162 (emphasis added).

*Critzer* differs from this case in that the defendant there had been advised by the Bureau of Indian Affairs that the income received from the transactions on the Reservation was exempt from taxation. The fact that Garber did not have the benefit of such official advice does not persuade us that the result here should be different. The *Critzer* court did not so limit its holding:

> It is settled that when the law is vague or highly debatable, a defendant—actually or imputedly—lacks the requisite intent to violate it.

498 F.2d at 1162. To hold otherwise would advocate convicting an unsophisticated taxpayer who failed to seek expert advice as to whether certain income was taxable while setting free a wise taxpayer who could find advice that taxes were not due on the identical type of debatably taxable income.

That *Critzer* was not decided on the basis of the defendant's actual intent is further evidenced by the reasoning of the court and its reliance on *James v. United States,* 366 U.S. 213, 81 S.Ct. 1052, 6 L.Ed.2d 246 (1961). In *James,* the Supreme Court put to rest a dispute over the taxability of embezzled funds. Fifteen years before *James,* the Court had held such funds non-taxable. *CIR v. Wilcox,* 327 U.S. 404, 66 S.Ct. 546, 90 L.Ed. 752 (1946). Subsequently a realigned Court undermined the viability of *Wilcox* by deciding that extortion money was taxable, distinguishing *Wilcox* on tenuous grounds. *Rutkin v. United States,* 343 U.S. 130, 72 S.Ct. 571, 96 L.Ed. 833 (1952). When the taxability of embezzled funds again reached the Court in *James,* it decided that *Rutkin* had in effect overruled *Wilcox* and that embezzled monies were taxable. Nevertheless, the court reversed James' conviction for willfully failing to report embezzled funds in violation of section 7201 because of the uncertainty of the law created by *Wilcox.* Significantly, neither *James* nor the cases following *James* required actual reliance on *Wilcox* to ne-

gate willful intent.[4] *Kahr v. CIR,* 414 F.2d 621 (2d Cir. 1969); *United States v. Dawson,* 400 F.2d 194 (2d Cir. 1968); *cert. denied,* 393 U.S. 1023, 89 S.Ct. 632, 21 L.Ed.2d 567 (1969); *Nordstrom v. United States,* 360 F.2d 734 (8th Cir. 1966), cert. denied, 385 U.S. 826, 87 S.Ct. 59, 17 L.Ed.2d 63 (1966). As noted in *Critzer* :

> the uncertainty created by *Wilcox* as a matter of law precluded a demonstration of "willfulness," without regard to the defendant's actual state of mind with respect to his knowledge or reliance on *Wilcox.*

498 F.2d at 1163.

Both *Critzer* and *James* involved disagreements among recognized authorities which were more clearly documented than the theories presented here. *James* involved conflicting Supreme Court decisions, and in *Critzer* the Bureau of Indian Affairs and the Internal Revenue Service strongly disagreed on the taxability of the income. In the case presently before us, as conceded by all the experts who testified, there is a dearth of authority directly supporting either argument. However, the fact that the question has never before evoked anything more than theories on either side adds to rather than detracts from the critical conflict upon which defendant's criminal liability hinges. Neither position is frivolous, and the fact that both are urged without clear precedential support in law demonstrates that the court should not have restricted the evidence or instructed as it did.

The tax treatment of earnings from the sale of blood plasma or other parts of the human body is an uncharted area in tax law. The parties in this case presented divergent opinions as to the ultimate taxability by analogy to two legitimate theories in tax law. The trial court should not have withheld this fact, and its powerful impact on the issue of Garber's willfulness, from the jury. *Morissette v. United States,* 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952); *United States v. Pomponio,* 563 F.2d 659 (4th Cir. 1977). In a case such as this where the element of willfulness is critical to the defense, the defendant is entitled to wide latitude in the introduction of evidence tending to show lack of intent. *United States v. Brown,* 411 F.2d 1134 (10th Cir. 1969); *Petersen v. United States,* 268 F.2d 87 (10th Cir. 1959); *Miller v. United States,* 120 F.2d 968 (10th Cir. 1941). The defendant testified that she subjectively thought that proceeds from the sale of part of her body were not taxable. By disallowing Nall's testimony that a recognized theory of tax law supports Garber's feelings, the court deprived the defendant of evidence showing her state of mind to be reasonable.

This error was compounded by the court's instructions to the jury which took from them the question of the validity of the tax. In effect, the court adopted the government's position that a tax was owing as a matter of law. Garber admitted receiving unreported money and disclosed its source; the defense in this case rested entirely on a denial of the necessary criminal intent to evade taxes. The court erred by refusing to instruct the jury that a reasonable misconception of the tax law on her part would negate the necessary intent. *See Morissette v. United States,* 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952); *Mann v. United*

---

**4.** The plurality opinion in *James* stated:

> We believe that the element of willfulness could not be proven in a criminal prosecution for failing to include embezzled funds in gross income in the year of misappropriation so long as the statute contained the gloss placed upon it by *Wilcox* at the time the alleged crime was committed. Therefore, we feel that petitioner's conviction may not stand and that the indictment against him must be dismissed. 366 U.S. at 221–222, 81 S.Ct. at 1057.

Justices Black and Douglas were of the opinion that *Wilcox* still represented the controlling law, but agreed with the plurality that the new determination finding embezzled funds taxable should not be applied to past conduct:

> [A] criminal statute that is so ambiguous in scope that an interpretation of it brings about totally unexpected results, thereby subjecting people to penalties and punishments for conduct which they could not know was criminal under existing law, raises serious questions of unconstitutional vagueness. 366 U.S. at 224, 81 S.Ct. at 1058.

The two dissenting Justices argued that a remand was necessary for a jury to determine the factual question of actual reliance on *Wilcox.*

*States,* 319 F.2d 404 (5th Cir. 1963); *United States v. Tadio,* 223 F.2d 759 (2d Cir. 1955); *Wardlaw v. United States,* 203 F.2d 884 (5th Cir. 1953). By withholding this theory, the court left the jury with the impression that a tax was clearly due and that Garber simply refused to pay it.[5] A panel of this court in *United States v. McClain,* 593 F.2d 658 (5th Cir. 1979), recently reached a similar conclusion when criminal liability for importing stolen Mexican artifacts depended on an interpretation of complicated, uncertain, and changing Mexican law declaring national ownership of artifacts. At the first trial, the district court heard *in camera* expert testimony interpreting the Mexican Constitution and relevant statutes, and instructed the jury on its determination of the foreign law. On appeal this was held to be error and the case remanded:

> The court's instruction that the Mexican government had owned the artifacts for over seventy-five years was highly prejudicial to the defendants. It could have been the decisive factor in the jury's inferring that the defendants must have known that the artifacts in question were stolen.

*United States v. McClain,* 545 F.2d 988, 1000 (5th Cir. 1977). The second trial was replete with historians, professors, and others expressing their views on the changing Mexican laws, based for the most part on independent review of the Mexican Constitution and relevant statutes. After hearing all the experts, the jury was given the task of first deciding whether and when Mexico actually enacted national ownership of the artifacts, and then determining the defendants' guilt based on that law. The defendants were convicted. Despite the "near overwhelming" evidence of guilt and intent to violate the law, the panel reversed the substantive convictions

> because the most likely jury construction of Mexican law upon the evidence at trial is that Mexico declared itself owner of all artifacts at least as early as 1897. And under this view of Mexican law, we be-

lieve the defendants may have suffered the prejudice of being convicted pursuant to laws that were too vague to be a predicate for criminal liability under our jurisprudential standards.

593 F.2d at 670.

■ Similarly in the case before us, the government presented persuasive evidence showing that the defendant knowingly and willfully evaded her taxes. She received a significant amount of money over a three year period, but reported none of it. The proof also showed that those with whom she dealt advised her that they thought the proceeds were taxable. Nevertheless, the tax question was completely novel and unsettled by any clearly relevant precedent. A criminal proceeding pursuant to section 7201 is an inappropriate vehicle for pioneering interpretations of tax law. The conviction is reversed and the cause is remanded for retrial.

REVERSED and REMANDED.

JAMES C. HILL, Circuit Judge, specially concurring:

Because I conclude that the transactions under investigation constituted services and the income derived therefrom taxable under 61(a)(1), I should have preferred that the court say so in positive terms. The question would thus cease to be a novel one for those considering it in the future.

It was a novel question when it arose here, however, and the defendant should have been permitted to demonstrate its novelty, not so that the jury could pass upon the tax consequences of the transactions, but so that the jurors could better determine the question of willfulness. The case should be sent back for retrial with the willfulness issue determined upon consideration of all the evidence.

I take it that, at some length, the majority winds up by doing just that. So, I concur.

---

5. During its deliberations, the jury asked the court whether any effort was made by the government to settle the case in any other way previous to filing an indictment. Obviously they were not aware that the taxability of the sums was still a disputed question.

AINSWORTH, Circuit Judge, with whom GODBOLD, TJOFLAT and ALVIN B. RUBIN, Circuit Judges, join, dissenting:

This dissent to the majority opinion is made on the basis of two principal issues involved in the trial in district court. The first of these follows.

1) Did the trial judge err in ruling, as a matter of law, that the income derived by defendant Garber was taxable?

The majority's statement of the facts is fairly complete, but a brief additional review of the evidence taken in light of the jury's guilty verdict is warranted. Plasmapheresis, the process in which appellant Garber was involved as a blood donor, is painful but does not result in permanent injury, since the body regenerates the removed plasma. Further, it is undisputed that appellant received large amounts of money for her plasma during the taxable years in question and that she did not report these amounts as income. The record demonstrates a continuing escalation in the amount received by appellant for her bleeds. Originally paid $200 per bleed, appellant increased that figure to $1,600 per bleed plus fringe benefits and a weekly salary of $200.

The evidence bearing on her intent to evade taxes is substantial. In her first engagement with Dade Reagents, Inc., appellant was advised by company officials on the tax consequences of her receipts. In accordance with that advice, a savings account was established in appellant's name for the purpose of creating a fund to cover her income tax liability. One quarter of the money paid for the bleeds was deposited by Dade into the savings account in Garber's name. Checks from Dade to appellant bore the notation "less accrual for taxes," that is, for the amount placed in the savings account. Appellant did not pay those funds, accrued for taxes, to the Government, but withdrew them for her personal use. Later, while employed by another company, appellant received a weekly salary which was declared by her as income. Appellant performed no services for the company beyond that as a plasma donor. Defendant Garber testified in her own defense that she did not think the funds were taxable since they were obtained by giving up something from her body. However, appellant was not told by any official of the Internal Revenue Service that the funds were not taxable, nor did she seek IRS advice in that regard. Moreover, appellant never sought any professional advice from a lawyer or an accountant on the taxability of the income.[1]

The majority opinion does not resolve the issue of whether defendant Garber's income as a blood donor was taxable but seemingly avoids a clear decision in this regard. It is true that considerable doubt is cast by the opinion on the taxability of the income. If, however, it is the majority's real view that the income was not taxable, it seems the opinion should say so and dismiss the indictment. However, the conviction is reversed

---

1. As we said in the panel opinion:

Joseph N. Potts, a former Dade superintendent, testified at trial that, when appellant first began selling blood plasma to Dade, he wanted her to be informed concerning the taxability of the payments made to her. A memorandum dealing with taxation was prepared for Garber, and Potts discussed the matter with her in his office. At Dade's suggestion a savings account was opened in Garber's name in which Dade was to deposit a portion of the payments to her so there would be funds available to pay income taxes. Dade made deposits in this account from 1967 to 1969 and the statements of earnings accompanying the checks issued to Garber during this period bore the notation "less accrual for taxes." She did not, however, pay the money in the account to the Government but gradually withdrew it for a variety of personal uses. Appellant testified at trial that she did not recall Potts telling her anything about taxes and, although she remembered the savings account, she stated that she did not recall that the account was for taxes or that the statements were marked "less accrual for taxes." She also testified that she filed a return for the 1969 tax year on which she had written: "I have no W-2 forms as my income was made up entirely from donating blood plasma from various blood banks." An employee of the IRS District Director's Office, however, later testified that the IRS had no record of a return for 1969 having been filed.
589 F.2d at 845-46.

and the case remanded for a retrial, a conclusion which thereby impliedly decides that defendant Garber's income was taxable though it holds that the question of willfulness was not properly submitted to the jury by the district court.

It is our view that defendant Garber's income was taxable and that Judge Fulton correctly ruled, as a matter of law, that it was. Further, his instruction to the jury that the income was taxable and withdrawal of that issue from the jury was a correct trial ruling.

Unfortunately, under the majority opinion, when the case goes back to Judge Fulton for retrial, he will be unable to tell from the majority opinion whether he correctly ruled that defendant Garber's income was taxable. The trial court should not be left in such a dilemma.

The primary legal issue involved in this matter is the construction of section 61 of the Internal Revenue Code, the basic provision of which states that "gross income means all income from whatever source derived." [2] The case law has often considered the reach of section 61 and its statutory predecessors in early versions of the Code. In adopting the income provision of the Code, Congress intended "to use the full measure of its taxing power." *Helvering v. Clifford*, 309 U.S. 331, 334, 60 S.Ct. 554, 556, 84 L.Ed. 788 (1940); *Blassie v. Commissioner*, 8 Cir., 1968, 394 F.2d 628. Accordingly, "Congress applied no limitations as to the source of taxable receipts, nor restrictive labels as to their nature . . . to tax all gains except those specifically exempted." *Commissioner v. Kowalski*, 434 U.S. 77, 82, 83, 98 S.Ct. 315, 319, 54 L.Ed.2d 252 (1978) (*citing Commissioner v. Glenshaw Glass Co.*, 348 U.S. 426, 429–30, 75 S.Ct. 473, 476, 90 L.Ed. 483 (1955)). The test to determine if certain receipts constitute income is whether there exist "undeniable accessions to wealth, clearly realized, and over which

the taxpayers have complete dominion." *Commissioner v. Glenshaw Glass Co.*, 348 U.S. 426, 431, 75 S.Ct. 473, 477, 99 L.Ed. 483 (1955). *See United States v. Allen*, 8 Cir., 1977, 551 F.2d 208. This court, in line with *Glenshaw Glass*, has stated that the key to understanding the term income as used in the Code is whether the receipts reflect "economic gain." *United States v. Gotcher*, 5 Cir., 1968, 401 F.2d 118. *See United States v. Rochelle*, 5 Cir., 1967, 384 F.2d 748, *cert. denied*, 390 U.S. 946, 88 S.Ct. 1032, 19 L.Ed.2d 1135 (1968).

Given its sweeping language, section 61 must be construed broadly "in accordance with an obvious purpose to tax income comprehensively." *Commissioner v. Jacobson*, 336 U.S. 28, 49, 69 S.Ct. 358, 369, 93 L.Ed. 477 (1949). *See Commissioner v. Smith*, 324 U.S. 177, 181, 65 S.Ct. 591, 593, 89 L.Ed. 830 (1945); *Ritter v. United States*, 393 F.2d 823, 826–27, 183 Ct.Cl. 875, *cert. denied*, 393 U.S. 844, 89 S.Ct. 127, 21 L.Ed.2d 115 (1968). It is recognized that section 61 is especially flexible since the concept of income must necessarily be adapted to changing circumstances.

The term "income" is particularly open to the well-known statement of the Court that:

> A word is not a crystal, transparent and unchanged; it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used.

> . . . [T]he Supreme Court . . . [has expressed] . . . the flexible attitude that the term "income" is to be given a broad meaning.

1 Mertens, Law of Federal Income Taxation, § 5.03, ch. 5, p. 5 (*citing Towne v. Eisner*, 245 U.S. 418, 425, 38 S.Ct. 158, 159, 62 L.Ed. 372 (1918)) (footnotes omitted). The legal principle governing the meaning of income as used in section 61 is thus well established.

(1) Compensation for services, including fees, commissions, and similar items;
(2) Gross income derived from business;
(3) Gains derived from dealings in property;

---

**2.** In pertinent part, 26 U.S.C. § 61(a) reads:
 Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including (but not limited to) the following items:

The above cases provide ample support for upholding Judge Fulton's decision that appellant's receipt of money in payment for her plasma was taxable income under section 61. While not addressing the precise fact situation presented here, they establish a working definition of income that is both comprehensive and broad. Nevertheless, the majority concludes that the reasoning which supports the taxability of the income is "without clear precedential support in the law." The definition of taxable income is well established, and the income in this case falls within the confines of the income definition enunciated in *Glenshaw Glass*. Undeniably, the funds represented an accession to wealth for appellant's economic benefit. The money was definitely realized; there is no issue as to the fact that the funds were received. Appellant had total control over the use of the money. The payments were not loans. The amount and value of the funds is uncontroverted; this is not a case where the taxpayer has received something of uncertain value. Thus, the applicable principles stated in the Supreme Court and Fifth Circuit decisions clearly establish that the funds were for appellant's economic benefit and accordingly constituted taxable income under the provisions of section 61.

The majority suggests that considerable doubt exists about the tax consequences of the income because the money could be considered as having been received in return for the sale of a product. "[B]lood plasma, like a chicken's eggs, a sheep's wool, or like any salable part of the human body, is a tangible property which in this case commanded a selling price dependent on its value." 607 F.2d at 97. If her plasma is treated as a product, appellant is entitled to deduct her cost basis in the plasma from her gross receipts in order to determine her taxable income. Yet, the distinction between an exchange for services and the sale of a product is only significant if defendant has a substantial basis in her plasma. If the basis is zero or minimal, then virtually all of the funds would be gain and hence taxable.[3]

Neither the appellant nor the majority has persuasively shown that appellant had anything but a zero basis in her plasma.[4]

---

3. Appellant may be entitled to deduct the cost of any special incidental expenses which she required to promote plasma regeneration such as vitamins. There is no evidence, however, suggesting that such incidental expense would offset anything more than an insignificant proportion of her total receipts. The possible existence of a minimal basis in her plasma is irrelevant since the Government need not prove the amount of tax due with mathematical precision, but need only show that a substantial tax is owing. *See, e. g., United States v. Miller*, 9 Cir., 1976, 545 F.2d 1204, *cert. denied*, 430 U.S. 930, 97 S.Ct. 1549, 51 L.Ed.2d 774 (1977); *United States v. Allen*, 6 Cir., 1975, 522 F.2d 1229, *cert. denied*, 423 U.S. 1072, 96 S.Ct. 854, 47 L.Ed.2d 82 (1976). Since the amount of tax owing under either the personal service or sale of a product theory is essentially the same, testimony concerning which theory is in fact proper in this case is irrelevant and would serve only to confuse the jury. *Cf. White v. United States*, 5 Cir., 1954, 216 F.2d 1, 4–5 (expert testimony whether income should be considered capital gain or ordinary income irrelevant since substantial tax would still be owing, and thus "defendant's guilt or innocence" would be unaffected).

4. Actually, appellant's primary argument has been that the income should be excluded from income by virtue of the operation of 26 U.S.C. § 104(a)(2) which permits a taxpayer to exclude "the amount of any damages received (whether by suit or agreement) on account of personal injuries or sickness." The majority, finding that a reversal was justified on other grounds, failed to address the section 104 issue. It is clear, however, that the provision does not apply to this case. The focus of section 104 pertains to funds received from tort claims. *See* 26 C.F.R. § 1.104–1(c) (1978) (damages as used in section 104 means "an amount received (other than workmen's compensation) through prosecution of a legal suit or action based upon tort or tort type rights, or through a settlement agreement entered into in lieu of such prosecution.") Federal courts have uniformly assumed that the section 104 exclusion applies only to payments resulting from the prosecution or settlement of tort claims. *See, e. g., Knuckles v. Commissioner*, 10 Cir., 1965, 349 F.2d 610; *Agar v. Commissioner*, 2 Cir., 1961, 290 F.2d 283. The touchstone of the exclusion is the notion that the funds received represent a restoration of funds rather than an accession to wealth. *Starrels v. Commissioner*, 9 Cir., 1962, 304 F.2d 574, 576. In this case, there is no evidence that any tort or tort-related claim is involved. To be sure, appellant suffered from pain and discomfort associated with the proc-

The majority suggests that appellant may have had a basis equal to the money received for the plasma. But none of the cases cited for this proposition are in point. For example, in *United States v. Davis*, 370 U.S. 65, 82 S.Ct. 1190, 8 L.Ed.2d 335 (1962), cited by the majority, a husband, pursuant to a property settlement agreement executed prior to a divorce, exchanged certain properties for his wife's release of her inchoate marital rights. At issue was whether the husband was required to realize the gain on the properties exchanged. The Court held that since the transaction was conducted at arm's length, the indeterminate value of the wife's marital rights was no bar to taxing the husband's exchange. The marital rights were deemed to be equal in value to the market value of the property received by the wife. As a result, the husband paid tax on the excess of market value over his original cost basis. Accordingly, the wife received a basis equal to the market value of the property since the husband had already been taxed on the appreciation over his original basis. There is no valuation issue in the instant case. As has long been recognized, *Davis* is a valuation case whose principles are most useful when no market exists for the product or item being exchanged. *See Bar L Ranch, Inc. v. Phinney*, 5 Cir., 1970, 426 F.2d 995; *Seas Shipping Co. v. Commissioner*, 2 Cir., 371 F.2d 528, *cert. denied*, 387 U.S. 943, 87 S.Ct. 2076, 18 L.Ed.2d 1330 (1967). However, the value of the plasma here is equal to the money paid for it to appellant.

This case contains none of the characteristics of *Davis* or the other cases cited by the majority.[5] The only explanation for the majority's allegiance to them is a misunderstanding between the concepts of value and basis. Basis, as defined in section 1012 of the Internal Revenue Code, is equal to "the cost of such property . . . ." Value, on the other hand, is set by the market. Gain is the difference between that value realized in a sale, and the cost basis of the property. Uniqueness is not ground for a tax exemption and the fact that appellant may be one of only a few persons with valuable plasma does not entitle her to immunity from payment of taxes on the large and substantial amounts paid to her each year. Her basis in the plasma is the cost of its constituent parts, which in this case is zero.

Our conclusion is reinforced by a number of cases holding that the burden of proving setoffs to income either in the form of expense deductions or cost basis adjustments is on the defendant. *See, e. g., Siravo v. United States*, 1 Cir., 1967, 377 F.2d 469, 473 ("evidence of unexplained receipts shifts to the taxpayer the burden of coming forward with evidence as to the amount of offsetting expenses, if any"); *United States v. Stayback*, 3 Cir., 1954, 212 F.2d 313 (no burden on government to prove defendant's cost basis in the goods sold), *cert. denied*, 348 U.S. 911, 75 S.Ct. 289, 99 L.Ed. 714 (1955); *United States v. Hornstein*, 7 Cir.,

---

ess. Yet, appellant chose to earn a living in this fashion and consented to the process, thus restricting the application of section 104. *Cf. Starrels v. Commissioner, supra*, 304 F.2d at 576. Thus, the funds were not excludable under section 104. Judge Clark conceded as much in his dissent to the original panel decision. *See* 589 F.2d at 849.

5. The majority's reliance on *Raytheon Production Corp. v. Commissioner*, 1 Cir., 144 F.2d 110, *cert. denied*, 323 U.S. 779, 65 S.Ct. 192, 89 L.Ed. 622 (1944), is especially misplaced. At issue in *Raytheon* was whether the money paid for settlement of an antitrust suit represented compensation for lost profits or for lost capital, i. e., Raytheon's goodwill in the injured business. The First Circuit held that the entire recovery in the case was taxable despite the

inability of the taxpayer to ascertain whatever basis may have existed in the goodwill lost. *See generally Messer v. Commissioner*, 3 Cir., 1971, 438 F.2d 774, 780. The dicta quoted by the majority, given the holding that the funds were taxable, thus occurred in a totally dissimilar factual pattern involving the dynamics of the settlement process. Here, there is no doubt concerning the source of the funds or the reasons why appellant received them. On the other hand, *Raytheon* involved a situation where the origin of the receipts was the primary question in the case. Thus, the situations are not at all similar, and the majority's use of *Raytheon* is difficult to fathom, except that it contains language, albeit dicta, that loosely speaks to the question presented here in a most indirect and imprecise manner.

1949, 176 F.2d 217, 220 (same). *See Burnet v. Houston*, 283 U.S. 223, 227–28, 51 S.Ct. 413, 415, 75 L.Ed. 991 (1931). Indeed, this court, in *United States v. Hiett*, 5 Cir., 1978, 581 F.2d 1199, 1202, stated in an analogous context that, "[i]n a prosecution for income tax evasion, once the government has established the defendant's unreported income . . ., it is not then required to prove that the defendant has no other deductions. The burden of proving additional deductions is on the defendant." *See McClanahan v. United States*, 5 Cir., 1961, 292 F.2d 630 (gambler must prove any offsetting gambling losses). In the present action, appellant has made no attempt whatever to demonstrate any ascertainable basis in her plasma, preferring to rely on the fallacious theory that her basis is hopelessly uncertain.[6]

The majority's holding is also unwise as a practical matter given the likely result of requiring the jury to consider the state of the law. "Obviously, it would be most confusing to a jury to have legal material introduced as evidence and then argued as to what the law is or ought to be." *Cooley v. United States*, 9 Cir., 1974, 501 F.2d 1249, 1254, *cert. denied*, 419 U.S. 1123, 95 S.Ct. 809, 42 L.Ed.2d 824 (1975). The jury is not composed of lawyers; the typical juror is untrained in legal affairs. To attempt to explain the myriad rules of judicial construction, the complexity of legal principles, or the function of precedent would hopelessly divert the jury from their preeminent duty of assessing appellant's guilt.

The second principal issue follows.

2) Did the trial judge properly submit the question of willfulness to the jury?

On the issue of willfulness, we first consider whether the trial judge erred in declining to permit the proffered testimony of defendant Garber's so-called expert Nall to go to the jury. The majority argues strenuously that this was probably the most serious of the errors committed in the trial since Nall's testimony would have shown that the law was so uncertain as to whether defendant Garber's income was taxable that she could not have had criminal intent to evade payment of taxes.

Our view is that receipt of opinion testimony of this kind as to pure issues of law invades the province of the district court. It is the trial judge who must make rulings on the law involved in the case, and boilerplate jury instructions have since time immemorial stated that the jury takes the law only from the court. Now a new rule is attempted by the majority which in effect states that the jury must take its instructions on the law from expert witnesses as well as the trial judge.

The majority's views concerning the admissibility of the proffered expert testimony is in conflict with existing precedent. Initially we point out that the district court

---

**6.** The majority's reliance on *United States v. Critzer*, 4 Cir., 1974, 498 F.2d 1160, and *James v. United States*, 366 U.S. 213, 81 S.Ct. 1052, 6 L.Ed.2d 246 (1961), for their view that appellant is entitled to a reversal is misplaced. *Critzer* involved the conviction of an Eastern Cherokee Indian for failing to report income from a business conducted on the Eastern Cherokee Reservation. The tax question was inordinately complex and required the construction of a 1924 statute which provided that the Reservation's property would be exempt from taxation. The question thus involved whether the business operations constituted income directly related to the property. The case law was obscure, although it generally favored the defendant. Moreover, the Bureau of Indian Affairs had advised the defendant on two separate occasions that the receipts were tax exempt. Indeed, the Department of Interior maintained at the time of trial that the monies were not taxable. The Fourth Circuit found that, as a matter of law, defendant was entitled to an acquittal since the taxability was "so uncertain that even co-ordinate branches of the United States Government plausibly reach directly opposing conclusions." *Critzer*, 498 F.2d at 1162. In *James*, the genesis of the controversy was the Court's earlier holding in *Commissioner v. Wilcox*, 327 U.S. 404, 66 S.Ct. 546, 90 L.Ed. 752 (1946), wherein the Court held embezzled funds to be tax exempt. *Wilcox* was undercut, but not explicitly overruled in *Rutkin v. United States*, 343 U.S. 130, 72 S.Ct. 571, 96 L.Ed. 833 (1952). The defendant in *James* had received embezzled funds and as a result fell into the legal abyss of uncertainty created by the two contradictory Supreme Court opinions. In *James*, the Court explicitly overruled *Wilcox*, but the conviction for willful evasion was reversed.

has "broad discretion in the matter of the admission or exclusion of expert evidence, and his action is to be sustained unless manifestly erroneous." *Salem v. United States Lines Co.*, 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313 (1962). *See Perkins v. Volkswagen of America, Inc.*, 5 Cir., 1979, 596 F.2d 681. The purpose of expert testimony is to "assist the trier of fact to understand the evidence or to determine a fact in issue . . . ." Fed.R.Evid. 702. The expert's testimony here involved a question of law properly reserved for the court's decision. Since there was no showing that appellant had consulted the expert or relied on his view, or views of any other accountant or lawyer, the testimony was unrelated to a determination of defendant's intent or willfulness.

Of course, a defendant is "entitled to wide latitude in the introduction of evidence tending to show lack of intent." 607 F.2d at 99. But the cases cited by the majority for this principle do not support the proposition that evidence unrelated to appellant's actual intent should be admitted. Indeed, the cases are to the contrary. *See, e. g., United States v. Brown*, 10 Cir., 1969, 411 F.2d 1134, 1137 (transcript of unavailable witness should have been admitted despite minor hearsay objection since theory of defendant's defense was reliance upon that witness' representations); *Miller v. United States*, 10 Cir., 1941, 120 F.2d 968, 970 (defendant may buttress personal statements of no intent "with testimony of relevant circumstances, including conversations had with third persons or statements made by them, tending to support his statement that he had no intent to defraud"); *Petersen v. United States*, 10 Cir., 1959, 268 F.2d 87 (when relying on lack of willfulness, defendant is entitled to character witnesses and proper instructions since character of defendant is directly at issue). The expert's testimony on the state of the law does not explain any of appellant's actions in this case and thus is not directly relevant to her actual intent or character. Thus, the evidence does not fall under the principles in those cases cited by the majority.

Indeed, other precedent directly supports the inadmissibility of the expert's testimony on the law. The question should be controlled by this court's decision in *White v. United States*, 5 Cir., 1954, 216 F.2d 1. In *White*, the trial judge refused to allow the defendant's experts to testify that certain funds should be treated as capital gains rather than ordinary income as the Government argued. On appeal, the court held that the testimony was properly excluded since the defendant had not relied upon the expert's opinion. "[T]he defendant not having acted in accordance with the witness' opinion and hence that opinion not being relevant on the question of intention, we think that the opinion of the witness as to the law of the case could not be substituted for that of the court . . . ." *Id.* at 5. *Cf. United States v. Caserta*, 3 Cir., 1952, 199 F.2d 905, 909 (where the purpose of expert testimony is "criticism of the government's legal theory," such evidence should be excluded).

The *White* decision is supported by precedents from other circuits. In *Cooley v. United States*, 9 Cir., 1974, 501 F.2d 1249, *cert. denied*, 419 U.S. 1123, 95 S.Ct. 809, 42 L.Ed.2d 824 (1975), defendant attempted to introduce into evidence a number of legal documents, including Supreme Court opinions, which allegedly supported his position that he had not acted willfully. The trial judge excluded the evidence, and on appeal the Ninth Circuit agreed. Since the defendant was not attempting to show that he had relied on those legal documents, the Court held that the "offered material was immaterial and should not have been admitted as evidence. In the orderly trial of a case, the law is given to the jury by the court and not introduced as evidence." 501 F.2d at 1253. Similarly, in *Lisansky v. United States*, 4 Cir., 31 F.2d 846, *cert. denied*, 279 U.S. 873, 49 S.Ct. 514, 73 L.Ed. 1008 (1929), the trial court excluded evidence from the defendant's expert witness that purported to demonstrate that profits from certain loans should not be taken into income until the loans themselves were repaid. The Fourth Circuit upheld the trial court's action by finding that the testimony

on the taxability involved a question of law reserved for the judge.

By the same experts, defendants offered to prove that in their opinion, based upon the decisions of the Revenue Department and of the courts as they understood them, it was proper for defendants not to report profits realized upon usurious loans until the loans themselves had been repaid. This also was properly excluded. The witnesses did not propose to testify that they advised defendants not to report these profits, nor did defendants testify that they relied upon the opinion of the experts in failing to report the same. What was required to be reported as income was a matter of law to be covered by the charge of the court, not by the testimony of experts.

31 F.2d at 851. Thus, under existing precedents it is clear that the inherent confusion which would result from receipt of expert testimony on the state of the law precludes such testimony where the defendant's actual reliance on the expert opinion is not involved.[7]

We next point out that the majority's view concerning the supposed impropriety of the judge's instruction on willfulness is similarly mistaken. An examination of the relevant authority relied upon by the majority demonstrates that those cases are not applicable in the circumstances here. *Morissette v. United States*, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952), involved a defendant who had taken bomb casings from government property thinking that they were abandoned scrap. The trial court ruled that the defendant had conclusively demonstrated the requisite intent merely by taking the casings. Thus, the defendant was unable to argue that he had a good faith belief that the casings were abandoned by the Government and the question of intent was taken away from the jury. In reversing the conviction, the Supreme Court held that the matter of intent was a question of fact which must be submitted to the jury. Similarly, in *Mann v. United States*, 5 Cir., 1963, 319 F.2d 404, *cert. denied*, 375 U.S. 986, 84 S.Ct. 520, 11 L.Ed.2d 474 (1964), the trial judge instructed the jury that an actor intends the natural and probable consequences of his acts. The court held that the result of this instruction was that the jury was essentially told that it could presume intent from the mere fact that an incorrect tax return had been filed. We held that it was "error to give a charge in a criminal case of this nature, the overall effect of which is to place a burden upon the defendant to produce evidence to overcome a presumption of guilt." 319 F.2d at 410. *See Wardlaw v. United States*, 5 Cir., 1953, 203 F.2d 884, 887 (instruction permitting presumption of intent held erroneous since effect was "to impress the jury with the belief that there was no good faith defense"). *Cf. United States v. Tadio*, 2 Cir., 223 F.2d 759 (asserting that it was error for trial court to instruct jury that particular accounting technique was unjustified, but upholding conviction since the overall instruction on intent clearly indicated that it was the Government's duty to demonstrate intent), *cert. denied*, 350 U.S. 874, 76 S.Ct. 119, 100 L.Ed. 772 (1955). In summary, the cases cited by the majority stand for the proposition that the trial judge may not refuse the defense of lack of intent or hinder its usefulness by creating a

---

**7.** A brief review of the testimony offered by appellant's expert demonstrates the extreme risk of confusion which would likely occur if introduced to the jury. The expert was not a lawyer, although he was an accountant with some experience in the Internal Revenue Service. In summary, his testimony was vague, and the only direct legal precedent offered involved personal injury cases and other allegedly analogous situations. The precedent cited is relatively old by tax law standards; most are from the beginning years of income tax adjudication. These materials are connected with the evolution of section 104 and thus only marginally related to the legal confusion the majority seemed to find since they left open the section 104 issue. Noticeably absent from the so-called expert's testimony is any mention of the host of more recent Supreme Court opinions construing section 61 broadly to reach any and all accession to wealth. Thus, the proffered testimony is at best a legal jumble whose introduction would in no way serve to edify the jury as to the issue of uncertainty which the majority addressed.

presumption which lowers the Government's burden of proof. The jury must be instructed that it is a defense to the charge if the defendant acted with a good faith belief in the propriety of his or her conduct.

The district judge in this case did not hamper appellant's right to a defense based upon her lack of criminal intent and he properly stated the applicable law. *Cf. United States v. Callahan*, 5 Cir., 1979, 588 F.2d 1078. The judge made clear that it was the jury's responsibility to determine intent from its consideration of all the evidence. He instructed that the appellant could not be convicted if her actions were "not voluntary and intentional on her part but [were] the result of a mistake or inadvertence or some other innocent reason. . . ." Thus, the good faith defense was not taken from the appellant as in *Morissette*. Furthermore, the judge did not create any presumptions which lowered the Government's burden of proof. *Cf. Mann v. United States, supra*, 319 F.2d 404. On the crucial issue of the relationship between the taxability of the income and the issue of appellant's willfulness, the trial judge made it absolutely clear that his ruling that the income was taxable in no way affected the jury's responsibility for determining intent. Directly after instructing that the income was taxable, the trial judge stated:

Whether the defendant wilfully and intentionally attempted to evade and defeat her income tax is a fact question which must be determined by the jury.

You are instructed that if a person in good faith believes that she has filed a correct tax return, she cannot be guilty of criminal intent to evade the tax law; but if a person acts without any ground for belief that her conduct is lawful, it is for the jury to decide whether she acted in good faith or whether she wilfully intended to evade her tax. This issue of whether the defendant wilfully attempted to evade her tax is one which the jury must determine from all of the evidence in the case which bears upon the defendant's state of mind at the time in question.

Thus, the jury was explicitly and correctly informed that regardless of the taxability of the income, the question of willfulness was solely their responsibility to be determined from the totality of the circumstances.

The majority somehow reads this instruction as creating an impression in the minds of the jury that appellant had simply refused to pay a tax clearly owed. This observation is unfounded. Appellant's testimony that she did not think the income to be taxable was still before the jury and represented the primary basis of her defense. Moreover, the judge had not cast any aspersions on appellant's character by instructing the jury that the income was taxable. As the trial judge instructed:

Now, during the trial of this case, there has been some evidence upon the issue of whether a blood plasma donor for pay is required to include monies thus received in a federal income tax return of the taxpayer. That issue involves an interpretation of the Internal Revenue Code and is, therefore, an issue of law for the Court and not an issue of fact for the jury.

Having considered this issue of law, the Court has determined and instructs you that any monies paid to the defendant in exchange for her blood plasma constitutes gross income, and, as such, is subject to federal income taxation.

His statement to the jury was direct and devoid of any excess or gratuitous remarks which may have implied guilt or misbehavior on the part of the appellant. The only interpretation possible from the instruction was there had been debate over a legal issue which the judge resolved in favor of the Government. It is clear that the jury was independently to assess the existence of willfulness. Certainly, this situation is not unique in tax evasion cases. Without taxable income, there would be no prosecution. Thus, the majority's point proves too much; most cases necessarily involve a situation where the taxability of the funds is "clear" to the jury and stated to be so by the court with the primary issue being whether the

defendant received those funds and possessed the requisite intent. In summary, the trial judge's instructions stated the law properly and gave appellant every right to a good faith defense.

We believe the original panel opinion in this case which affirmed defendant Garber's conviction was correct and for the reasons there expressed and expanded here. No valid reason has been shown to change that result.

TJOFLAT, Circuit Judge, with whom AINSWORTH and ALVIN B. RUBIN, Circuit Judges, join, dissenting:

I would affirm the conviction of defendant Garber for essentially the reasons stated by Judge Ainsworth. The majority opinion disturbs me more by its analysis than by its result, however. The majority says that the Government should never have prosecuted Garber for tax evasion. The criminal proceedings were "inappropriate," the majority intimates, because it is an open question whether the proceeds of her blood plasma constituted taxable income and because even if they were taxable, the doubt surrounding the taxability issue suggests that Garber could not have had the willfulness that is an essential element of the crime of tax evasion. Notwithstanding the majority's belief that the prosecution was a mistake, it apparently feels trapped by an assumption that the Government is *entitled* to prosecute Garber. The majority's response is to manufacture a rule of evidence that might permit Garber to extricate herself.

The new rule of evidence embraces *any* case where someone is charged with an offense involving willfulness. If the defendant avers that the requirements of the law were too vague to give adequate notice, the trial court must permit the parties to call to the stand "experts" to give their opinions about the state of the law. I have no doubt that this innovation in trial procedure, by allowing the jury to consider matters irrelevant to factual issues, will spawn unfair convictions and acquittals. In addition, the rule will inevitably lead to a protracted and unmanageable sequence of impeachment and rehabilitation of every expert allowed to present such testimony. My intention is first to demonstrate that this new rule springs from the majority's failure to confront straightforwardly certain legal questions that this court has the responsibility to resolve and second to define exactly why I think the majority's holding will have such a pernicious effect.

The case before us involves three distinct issues that are present in every tax evasion prosecution. The threshold issue is whether the "income" in question is subject to federal income taxation. If the "income" is taxable, the trial court next must determine whether the civil obligation to pay taxes was sufficiently clear to support a criminal prosecution for tax evasion. Finally there arises the factual issue whether the defendant acted with the willfulness that is an essential element of the crime. The majority's analysis goes astray, in my view, by confusing the legal issues of taxability and sufficiency of notice with the factual issue of intent. For the court to dispose of this appeal properly, it is essential that these three issues be sorted out and considered individually.

I

Dorothy Garber was charged under section 7201 of the Internal Revenue Code with willfully attempting to evade her obligation to pay taxes on "income" she received for her blood plasma. This allegation is premised on the notion that Garber actually had such an obligation. Of course, section 7201 does not itself create any duty to pay taxes; it merely sets out criminal sanctions that enforce the tax liability imposed by other sections of the Internal Revenue Code. Whether Garber was actually liable for taxes on the sums in question depends on whether those sums are a part of her "gross income" within the meaning of section 61(a) of the Internal Revenue Code. This question of the meaning of "gross income" is purely a legal one, a matter of statutory construction. *See, e. g., Haverly v. United States*, 513 F.2d 224 (7th Cir.), *cert. denied*, 423 U.S. 912, 96 S.Ct. 216,

46 L.Ed.2d 140 (1975). Such a question of law is for the court alone, *United States v. Seaboard Coast Line Railroad*, 368 F.Supp. 1079, 1083 (M.D.Fla.1973), although the court would certainly be free to consider the opinions of the parties' experts or any other sources of authority in making this threshold determination.

At the outset of the trial, Judge Fulton endeavored to determine whether the defense intended to challenge the indictment by contending that the proceeds from the plasma sales were not "income." Record, vol. 2, at 2–12. If the monies were not "income" he would have had no choice but to dismiss the indictment under Fed.R. Crim.P. 12(b)(2) for failure to charge an offense. Strangely, the defendant's attorney ignored this opportunity to move for a dismissal; rather, he expressed the view that the taxability of the sale proceeds was not a question of law for the court but a factual issue for the jury. Counsel implied that he would introduce proof that in the defendant's mind, the proceeds were not taxable. Judge Fulton responded:

> Well, we are talking about two different things. I think I understand your position. Certainly your client can contend in this case and you can argue, if the facts justify and support that argument, that your client did not have the requisite intent . . . but I think that whether it is income or not is a question of law for the Court.

Record, vol. 2, at 11. Although counsel declined to address the legal question whether the indictment charged an offense, the trial court clearly could have dismissed the indictment sua sponte. *United States v. Purvis*, 580 F.2d 853, 858 (5th Cir. 1978),

cert. denied, 440 U.S. 914, 99 S.Ct. 1229, 59 L.Ed.2d 463 (1979). The court effectively sustained the indictment on this point, however, when it ruled that the proceeds were income.[1] I believe Judge Ainsworth's analysis conclusively shows that this ruling was correct. The majority casts doubt on the ruling but purportedly declines to settle the issue. Nevertheless, the majority apparently *assumes* that the sales proceeds are taxable income and that the indictment is sufficient, for the opinion hinges on an evidentiary question that would otherwise never arise. If the court really believes that the monies are not taxable, it is unfortunate that it does not so hold and avoid an unnecessary retrial.

II

After ruling on the taxability issue, the district court was confronted with a second question of law: whether, at the time of the alleged tax evasions, the taxability of the monies was so uncertain as to make it fundamentally unfair to prosecute Garber. Due process requires that the language of a criminal statute convey "sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices." *Jordan v. De George*, 341 U.S. 223, 231–32, 71 S.Ct. 703, 708, 95 L.Ed. 886 (1951). At the commencement of trial, Garber's attorney argued to the court that the taxability of the monies is "so uncertain" that "defendant cannot be guilty of willfully evading and defeating taxes on income." Record, vol. 2, at 16. This argument contained the essential elements of the vagueness challenge, although it was not put squarely in those terms or in the

---

1. Judge Fulton indicated in the colloquy at the beginning of the trial that he considered the monies in question to be income. Since the defense made no motion for a judgment of acquittal at the conclusion of the Government's case-in-chief, he was not called upon to rule on the issue at that time. It was not until the defense proffered the testimony of Nall that the issue was disposed of as a matter of law. Record, vol. 3, at 431.

The Government agreed with Judge Fulton that the taxability of the monies is a question

of law for the court. *Id.*, vol. 2, at 3. The prosecutor proffered the testimony of the Government's expert, Bierman, *ante* 607 F.2d at 94–95, solely as a precautionary measure. At the close of Bierman's proffer, the prosecutor told the court: "[T]he Government . . . would not request that this witness testify to the Jury unless the Court plans on allowing expert witnesses to testify for the Defense on the law." Record, vol. 3, at 332.

form of a motion to dismiss the indictment.[2] Here the vagueness issue is whether the obligation to pay taxes on monies received for plasmapheresis was too uncertain to give notice that a taxpayer who willfully evaded such taxes would be subject to prosecution under section 7201. The question narrows to the consideration whether it was or should have been reasonably clear to Garber that those monies were a part of her "gross income" within the meaning of section 61(a). Although "common understanding and practices" are the standards by which the adequacy of the notice given by a criminal statute is to be measured, it is settled that the question of vagueness is for the court rather than the jury. The question is separate from the court's threshold inquiry whether the monies are taxable at all. The court might well have held that although the monies are taxable, their taxability was so uncertain at the times when Garber filed her returns that she did not have constitutionally sufficient notice of the conduct proscribed by section 7201. If this had been the court's conclusion, the proper disposition of the case would, again, have been to have dismissed the indictment under rule 12(b)(2). Whereas the trial judge did not rule specifically that the obligation to pay taxes was not unconstitutionally vague, he effectively rejected any vagueness challenge when he sent the case to the jury.

*United States v. Critzer*, 498 F.2d 1160 (4th Cir. 1974), relied on by the majority, suggests what is essentially another approach to the vagueness issue. *Critzer* is premised on the proposition that "when the law is vague or highly debatable, a defendant—actually or imputedly—lacks the requisite intent to violate it." *Id.* at 1162. The court held that "willfulness" could not be shown in a prosecution under section 7201 given the uncertainty concerning whether the sums in question were taxable:

> *As a matter of law*, defendant cannot be guilty of willfully evading and defeating income taxes on income, the taxability of which is so uncertain that even co-ordinate branches of the United States Government plausibly reach directly opposing conclusions. *As a matter of law*, the requisite intent to evade and defeat income taxes is missing.

*Id.* (emphasis added). As under the conventional "vagueness" analysis, the inquiry focuses on the certainty of the obligation to pay taxes at the time the tax return was filed. *Id.* at 1164. Under either approach, if the obligation was unclear, the defendant *cannot be guilty as a matter of law*, so the indictment should be dismissed for failure to charge an offense.

Just after discussing *Critzer*, the majority opinion says:

> The tax treatment of earnings from the sale of blood plasma or other parts of the human body is an unchartered area in tax law. The parties in this case presented divergent opinions as to the ultimate taxability by analogy to two legitimate theories in tax law. The trial court should not have withheld this fact, and its powerful impact on the issue of Garber's willfulness, from the jury.

*Ante* at 99. While I agree that *Critzer* says that the clarity of the law has an impact on Garber's willfulness, *Critzer* does not support the suggestion that confusion in the tax laws is a "defense" that should be considered by the jury. The *Critzer* court reiterates that the impact of any vagueness of the law on the defendant's intent is a matter of law—a determination to be made by the court alone.

Under either the conventional vagueness analysis or the *Critzer* analysis, the question on appeal is whether Judge Fulton *should* have dismissed the indictment on the ground that the taxability of the monies was too unclear to support criminal liability. My view is that the monies were so clearly a part of Garber's "gross income" that no reasonable person could have supposed oth-

---

**2.** Whether or not the question was properly raised below, this court may consider the sufficiency of the indictment on appeal. *United States v. Seuss*, 474 F.2d 385, 387 n.2 (1st Cir.)

*cert. denied*, 412 U.S. 928, 93 S.Ct. 2751, 37 L.Ed.2d 155 (1973); 8 Moore's Federal Practice ¶ 12.03[1], at 12–16 & n.9 (2d ed. 1978).

erwise. The majority, on the other hand, appears to give much credence to Garber's contention that she reasonably supposed the monies to be nontaxable.[3] If this is the majority's persuasion, the proper resolution of the case would be to dismiss the charges as the court did in *Critzer*, not to remand for a new trial. Since the certainty of the law would be assessed as of a past date, a dismissal on this ground would be perfectly consistent with a ruling that money received for blood plasma is indeed taxable. Thus, no future defendant in Garber's position could escape under the same vagueness challenge.

The majority's mysterious refusal to follow the logic of its reasoning and dismiss the indictment leads to certain inconsistencies. The opinion, like the opinion in the *Critzer* case, ends with the observation that "[a] criminal proceeding pursuant to section 7201 is an inappropriate vehicle for pioneering interpretations of tax law." *Ante* at 100. This conclusion makes sense in *Critzer*, but in the present case it is blatantly inconsistent with the court's decision that there should be a *new* "criminal proceeding" that will allow the jury to hear evidence concerning the certainty of the tax laws.

### III

The court need consider the propriety of Judge Fulton's refusal to admit the testimony of Nall, Garber's expert, only if we find that Judge Fulton correctly declined to dismiss the indictment. Assuming that the indictment *is* sufficient, the critical issue in the case becomes a factual one: whether Garber acted with the requisite willfulness in failing to pay taxes on the sums in question. To be admissible, the proffered testimony must be relevant to this issue, Fed.R. Evid. 402,[4] and its probative value must outweigh the danger of unfair prejudice, confusion of the issues, or misleading the jury. Fed.R.Evid. 403.[5] I conclude that Nall's testimony is not relevant to Garber's intent, and that it certainly fails the weighing test. I would hold, therefore, that Judge Fulton properly excluded the evidence.[6] It is necessary to examine closely this relevance issue to show the dangers created by the majority opinion.

### A

The factual question for the jury, narrowly stated, was whether Garber had an honest belief that the money she had received for her blood plasma was nontaxable. The inquiry is a subjective one. Garber's belief does not have to have been reasonable; in fact, if her asserted belief *had been* reasonable, presumably the indictment should be dismissed for failure to charge an offense. The majority opinion obscures the subjective nature of the issue: "The court erred by refusing to instruct the jury that *a reasonable misconception* of the tax law on her part would negate the necessary in-

---

3. For example, at the conclusion of the opinion the court states that "the tax question was completely novel and unsettled by any clearly relevant precedent" and suggests that the case involves "pioneering interpretations of tax law." *Ante* at 100.

4. Rule 402 states:

 All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, by these rules, or by other rules prescribed by the Supreme Court pursuant to statutory authority. Evidence which is not relevant is not admissible.

5. Rule 403 provides that:

 Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice,

confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

6. This court has sometimes made the distinction between "logical relevance" and "legal relevance." *See, e. g., Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1347 (5th Cir. 1978). Evidence is said to be "logically relevant" if it has any probative value and "legally relevant" if that probative value outweighs the counter factors of prejudice, confusion, and repetition. In this discussion I have adopted Professor McCormick's view that it makes for clearer thinking to discard the term "legal relevancy" altogether and use "relevancy" to refer to what has been called "logical relevancy." *See* McCormick, Evidence § 185, at 441 (2d ed. 1972).

tent." *Ante* at 99, (emphasis added).[7] By drawing the notion of reasonableness into the inquiry, the majority improperly broadens the scope of relevancy, causing certain evidence to appear admissible although it would be excluded if the factual issue were correctly identified.

Fed.R.Evid. 401 defines relevant evidence as evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *See, e. g., United States v. Madera*, 574 F.2d 1320, 1322 (5th Cir. 1978). Garber sought to introduce expert testimony that the taxability of the plasma sales proceeds was in doubt. Conceivably, there are two ways in which such testimony might be relevant. It might provide evidence of the defendant's state of mind, or it might indirectly buttress her explanation of her actions. Concededly, there was never any communication between Garber and Nall. Record, vol. 3, at 430. Since Nall neither influenced Garber's opinion nor learned of her opinion, it follows that he could have nothing to say that would bear directly on Garber's intent. So if Nall's proffered testimony is relevant at all, it can only be relevant through reinforcing the credibility of Garber's explanation.

On direct examination, Garber was asked whether, at the time she entered into the plasma sale contracts, she had come to any conclusion concerning whether the monies she was to receive were taxable. She replied:

> I had arrived in my own mind that it was definitely not taxable, that this was their

gain, a part of me, it was my body, it was a very human element . . ., and I felt that it definitely was not taxable, that it was like I said, part of me, something—

*Id.* at 370. Garber testified that she had discussed this idea that sales of portions of the human body are inherently nontaxable with fellow donors and with her husband, but that she had never sought any professional advice about her theory. *Id.* at 370–80.

On the proffer of his testimony, Nall, like Garber, stated that he considered the proceeds of the plasma sales nontaxable, but that is the extent of the similarity between his testimony and Garber's. Nall bases his opinion solely on his reading of the law. For example, when he was asked, "Sir, when would you say that, if somebody, based upon what you say, sold his plasma, that there is no income because there is no way of determining the basis?", he responded:

> Under this particular concept of the Supreme Court definition of income, the amount received for the part of the body . . . if a person did sell a part of their body, no, there would not be a taxable transaction.
>
> I might add, if I may . . . that the Solicitor's Opinion 132 said, "No, these things are not income by reason of the definition of income . . . ."

*Id.* at 425.

In deciding the relevancy of this testimony, the trial judge should have, in essence, asked himself whether a reasonable juror could believe that the proffered testimony makes it more probable that Garber actual-

---

7. None of the cases cited by the majority in support of this proposition suggest that the *reasonableness* of the defendant's belief is material. Rather, they make it clear that there is *no* requirement of reasonableness. For example, in *Mann v. United States*, 319 F.2d 404, 409 (5th Cir. 1963), *cert. denied*, 375 U.S. 986, 84 S.Ct. 520, 11 L.Ed.2d 474 (1964), the court held erroneous a jury instruction that imported the notion of reasonableness:

> [Section 7201] specifically provides that the crime of income tax evasion must be accompanied by a specific intent on the part

of the accused to defeat or evade the tax, which must be proved by independent evidence. . . . Under the instruction here involved, the jury is invited to speculate as to what any other person similarly situated to [the defendant] and with like knowledge, would reasonably have expected to be the consequences of the conduct under consideration as shown by the evidence. The test is whether [the defendant] himself wilfully attempted to evade or defeat the tax.

*Id.* at 409 (citation omitted).

ly believed no tax was due on the money. *See, e. g.*, McCormick, Evidence § 185, at 438 (2d ed. 1972). I am certain that what this professional accountant concluded after studying the law could not make one whit more or less probable the truth of Garber's explanation that she had not paid taxes on what she had received for plasmapheresis because "in my heart I did not feel it was taxable . . . ." *Id.* at 361. Therefore, the proffer does not pass the rule 401 test, and the testimony should be excluded.

The relevance issue could possibly be resolved differently if the expert's testimony bore some relation to the context of the defendant's explanation. For example, an accountant might testify, "I have advised twenty laypeople concerning the taxability of transactions analogous to the ones in the instant case. None of them have communicated with Mrs. Garber, and none of them have had any more legal training than Mrs. Garber. Seventeen of the twenty told me that they had a gut feeling—like the feeling Mrs. Garber testified she had—that the monies they had received were not taxable." Putting aside the hearsay problem, it appears that a juror might reasonably infer from this statement that since other people have the belief that Garber says she had, it is slightly more likely that Garber did indeed have the belief.[8] On the other hand, such an inference would not be reasonable if it could be shown: that the expert was somehow not qualified to present the proffered testimony; that the seventeen people did not state their opinions in good faith; or that the situations were not truly analogous. Consequently, on the proffer of such testimony, the Government would have been entitled to cross-examine the expert in an effort to exclude his opinion altogether.

Failing that, the Government would have the option to call each of the seventeen people and to cross-examine them in order to destroy the foundation of the expert's testimony and thus to demonstrate its irrelevancy for lack of probative value. Cross-examination and rehabilitation could go on forever, and the principal issues in the trial would be lost in this sea of collateral nonsense.

**B**

Even if the relevancy of this hypothetical testimony is established, the testimony should still not be admitted into evidence because the danger of prejudice and confusion manifestly outweighs the mere scintilla of probative value. The process of impeachment and rehabilitation before the jury would be just as wide-ranging as in the voir dire hearing on relevancy. In fact, even if the problem could be escaped in the voir dire hearing, it would certainly surface in the presence of the jury. The trial would no longer be focused on the defendant's intent, but on the intent of each of the people embraced by the expert's testimony. The case would quickly become untriable.

The majority's holding is so broad that it would require the admission of testimony that is even more destructive of the trial process than my hypothetical testimony. The majority opinion says that the trial court should have permitted Nall to testify simply as to the "unresolved nature of the law," *ante* at 98, or as to the "reasonableness" of Garber's belief, *ante* at 99. This testimony is less relevant than testimony referring to the opinions of a particular number or percentage of people because it requires an additional inference. The testimony is not probative unless the jury can

---

**8.** *Cf. Haigler v. United States*, 172 F.2d 986 (10th Cir. 1949), where a rancher defended a prosecution for willful evasion of income tax with the argument that he had acted in accordance with what was "generally understood among sheepmen." *Id.* at 988. The court apparently assumed that testimony concerning the beliefs of the other sheepmen would be relevant and admissible. Note that the *Haigler* case differs from my hypothetical in that I am assuming that none of the seventeen people communicated with Garber. There may well have been communication about the issue between the *Haigler* defendant and the other sheepmen, so the testimony could be seen as directly probative of the defendant's state of mind. The testimony that I hypothesize, like the pure opinion testimony the majority holds should come in, goes only to the question of credibility of the defendant's exculpative explanation.

assume: (a) since this "expert" says there was doubt as to the state of the law, it is likely that a number of people believe that money such as that received by Garber is not taxable; (b) since other people have the belief that Garber says she had, it is somewhat more likely that she actually had the belief.

My major concern here is that these inferences are so questionable that it is reckless to permit a jury to indulge them. The danger is that the jury will see the relationship between Nall's opinion and Garber's belief as much more substantial than it could possibly be. The risk of confusion inherent in juror unfamiliarity with the assessment of probabilities is here compounded by the intellectual, abstract character of the evidence; it has no place in the factual context of the case. Jurors can draw on their own experience in assessing most circumstantial evidence. They will be traveling without a map, however, when they attempt to determine the impact of one man's legal theories on the probability that Garber's story about her state of mind, when she declined to report the monies as income, is the truth.

An even more serious problem results from the jury's being asked to assess the *merits* of Nall's legal opinion. In essence, Nall's testimony is that Garber's asserted belief is reasonable. Presumably, the more meritorious Nall's opinion, the greater the number of people likely to share the opinion and the greater the probability that Garber is telling the truth. But however per-

suasive Nall may be, the court has already concluded in deciding the vagueness issue that the belief Nall is defending is *not* reasonable. The risk is that the jurors, who lack the training necessary to assess legal arguments, will too willingly accept the expert's opinion. To permit the jury to base its verdict on an interpretation of the law that is at odds with the court's will inevitably create the appearance of injustice. Assuming that the testimony is relevant, I believe that it would be foolhardy to lead the jury onto such treacherous ground when the possible benefits are so miniscule.[9]

### IV

Expert testimony about the state of the law will not only befuddle the jury; it will, in my view, utterly undermine the usual constraints on expert testimony, creating the potential for intolerable abuses. Until today, there has been a requirement that expert opinion testimony be founded on facts or data that comprise the context of the alleged offense. *See* Fed.R.Evid. 703. Under the majority's approach, however, the expert may ignore the factual context and say nearly anything he desires about the legal issues in the case. Opposing counsel will find it impossible to lock him into a particular interpretation of the law because the range of his interpretation is practically infinite. The bestowal of such freedom on expert witnesses creates the opportunity for a well-coached expert to "manufacture" testimony while he is on the stand, shaping

9. Neither *Nordstrom v. United States*, 360 F.2d 734 (8th Cir.), *cert. denied*, 385 U.S. 826, 87 S.Ct. 59, 17 L.Ed.2d 63 (1966), nor *United States v. Bridell*, 180 F.Supp. 268 (N.D.Ill.1960), cited by the majority, support the admissibility of this expert testimony. In *Nordstrom,* the defendant did not argue that the alleged vagueness in the law was relevant to his actual intent. Rather, he argued that due to the vagueness "the Court cannot attribute to him the requisite intent to violate the tax law." 360 F.2d at 735. The court admitted that for the defendant to be convicted, "his civil liability must have been so clearly the law at the time the erroneous return was filed that failure to report the embezzled funds amounted to a willful evasion," *id.*, but held that the law had been clear. Certainly, the court did not address the

question whether the state of the law was relevant to the defendant's intent. It was talking about the sufficiency of the indictment, a purely legal question. *See United States v. Mann*, 517 F.2d 259, 266 (5th Cir. 1975), *cert. denied*, 423 U.S. 1087, 96 S.Ct. 878, 47 L.Ed.2d 97 (1976). In *Bridell*, another tax evasion case, the court said: ". . . I have taken into consideration the fact that the law is more clearly delineated today, as to the offense charged, than it was during the years in question . . . ." *Bridell*, 180 F.Supp. at 279. *Bridell* must be distinguished, however, on the ground that the trial in that case was a bench trial, so there was no need for the court to be concerned about the danger of prejudice and confusion as it must be in a jury trial.

his testimony to fit the facts that counsel has succeeded in eliciting from the defendant.

I think it manifest that the danger of prejudice and confusion that would result from the admission of testimony like that proffered by Nall outweighs any probative value. But even if this court should weigh the probative value and prejudice elements differently, we should affirm Judge Fulton's ruling as clearly within the broad discretion a trial judge has under rule 403. *See United States v. Johnson,* 558 F.2d 744, 746 (5th Cir. 1977), *cert. denied,* 434 U.S. 1065, 98 S.Ct. 1241, 55 L.Ed.2d 766 (1978). Unfortunately, however, the majority has avoided the rule 403 weighing process altogether.

A further difficulty with the majority's holding is that it apparently *requires* the district court in a case like this to permit practically anyone professing expertise in the subject to give his opinion about the law. The trial is likely to degenerate into a confused battle among experts. Such a situation can benefit no one but the experts themselves.

The majority's failure adequately to consider the consequences of the rule of evidence that it has fashioned is particularly grave because what we decide today may prove irretrievable. I suspect that in future criminal trials involving the defendant's state of mind, the introduction of expert testimony concerning the state of the law will be initiated by the defense.[10] Once the trial judge has upheld the sufficiency of the indictment, the Government can have no interest in showing the clarity of the law unless the defense first presents testimony that it is vague or that the defendant's misunderstanding of the law was reasonable. If the defense introduces such testimony and the defendant is acquitted, that will

be the end of the matter, since the Government has no right of appeal.

Alternatively, suppose that the defendant introduces expert testimony that the law is vague or that the defendant's misconception was reasonable and that the Government counters with expert testimony to the contrary. If the defendant is convicted, he may choose to argue on appeal that the trial court committed reversible error when it permitted the Government's expert to testify. He can hardly object to the nature of the testimony—to its relevance to any fact in issue—because he put in testimony of the same character. Thus, his complaint on appeal will have to be that the court should have excluded the Government's testimony, even assuming that it was relevant, on grounds of prejudice, confusion, or waste of time. Fed.R.Evid. 403. The trial court has broad discretion in deciding whether to exclude evidence on these grounds, however, and this court "may not disturb his ruling unless he has clearly abused his discretion." *United States v. Johnson,* 558 F.2d at 746. In my opinion, this restricted standard of review will prove an inadequate tool for repairing the damage made possible by the majority's holding.

Because I conclude that the district court correctly decided the issues of law before it and properly excluded "expert" testimony concerning the state of the law, I would affirm Garber's conviction.

---

10. For example, in a criminal antitrust prosecution arising from a complex series of business transactions, a defendant may admit the alleged transactions but contend that he had not believed his actions unlawfully anticompetitive. The defense is that the defendant has not acted with the mens rea required for a criminal conviction. *See United States v. United States Gypsum Co.,* 438 U.S. 422, 431–433, 98 S.Ct. 2864, 2876–78, 57 L.Ed.2d 854 (1978). The antitrust defendant would surely welcome the opportunity to put a law professor or some other expert on the stand to testify as to vagueness in the law or to the reasonableness of the defendant's belief in the legality of his conduct.