**UNITED STATES of America**

v.

**James HOWARD.**

**No. CR86–277A.**

United States District Court,
N.D. Georgia,
Atlanta Division.

March 11, 1987.

Stephen S. Cowen, Julie E. Carnes, U.S. Atty's Office, Atlanta, Ga., for U.S.

Richard H. Sinkfield, Peter W. Schneider, Rogers & Hardin, Atlanta, Ga., for defendant.

ORDER OF COURT

MOYE, Chief Judge.

Defendant James Howard, a former [1] Atlanta City Councilman, was convicted of intentionally signing false tax returns for the tax year 1982, a violation of 26 U.S.C. § 7206(1).[2] The defendant now moves for a new trial pursuant to Fed.R.Crim.P. 33 or, in the alternative, for a judgment of acquittal pursuant to Fed.R.Crim.P. 29.

On June 1, 1982, James Howard signed a "Consulting Agreement" (hereinafter referred to as "Consulting Agreement" or "Contract") in which he purported to agree that, in exchange for a $300,000 fee, he would act as a consultant to real estate developer James McMahan in connection with the sale or development, as an office complex named Resurgens Plaza, of a specific parcel of land in the Johnsontown community, near the Lenox Square Marta Station in Atlanta, Georgia. The Contract acknowledged that $25,000 had already been paid thereunder to Councilman Howard, and that an additional $25,000 was to be paid by June 30, 1982. The remaining $250,000 was to be paid when certain events occurred, namely the land was sold or developed. In addition, the Contract provided that out-of-pocket costs for home improvement work performed by Mr. McMahan for Councilman Howard would be deducted from the $250,000 due.

At trial, the Government presented evidence that in 1982 the defendant received a total of $118,400 in monies from Mr. McMahan and an additional $50,820.38 in home improvements. In 1983, at a time when Mr. McMahan was on the verge of selling the land to Mr. John Stabler, the Consulting Agreement was amended to increase the total consulting payments due from $300,000 to $475,000. In 1983, the defend-

---

1. Two days after being convicted, Mr. Howard resigned from the city council.

2. 26 U.S.C. § 7206(1) provides as follows:
 Any person who—
 (1) *Declaration under penalties of perjury.*—Willfully makes and subscribes any return, statement, or other document, which contains

or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter;

\* \* \* \* \* \*

shall be guilty of a felony. . . .

ant received $75,000 from Mr. McMahan, an additional $5,000 was paid to a third-party on his behalf, and $29,996.73 was spent on home improvements for Mr. Howard. On January 5, 1984, the defendant received a single payment of $192,887 from Mr. McMahan, bringing the total fees paid close to the agreed upon $475,000.

Count One of the government's indictment charged that the defendant's original 1982 individual income tax return was false in that the defendant did not report any of the gross receipts he had received from Mr. McMahan in that year. A year after filing his original 1982 return, and following a news media disclosure of the existence of his Consulting Agreement with Mr. McMahan, the defendant amended his 1982 return by adding $25,000 in gross receipts. Count Two alleged that this amended return was still false in that it omitted additional gross receipts which Councilman Howard had received from Mr. McMahan in 1982.

The defense contends that the payments that Mr. Howard received were for legitimate services performed and to be performed under the Consulting Agreement and that the reason that the defendant did not report these payments on his 1982 tax return was that he believed that he could defer reporting that income until the Contract was completed. The government, on the other hand, contends that the Consulting Agreement was a sham contract and that Mr. Howard never had any intention of reporting the money he received from Mr. McMahan. The government presented evidence at trial to show that, at the same time that Mr. Howard was receiving payments, he was lobbying for Mr. McMahan before the Atlanta City Council on numerous occasions to get zoning applications approved on other development projects which Mr. McMahan had in the Lenox Square area. The government contended that the Consulting Agreement was an artifice employed by Mr. Howard and Mr. McMahan to cover up what were, in reality, bribery payments. The government contended that the defendant felt secure in not reporting such payments, being confident that Mr. McMahan would not divulge their financial dealings because of their scandalous nature. According to the government, the ruse unraveled when Councilman Howard sought to arrange for similar "consulting" payments of the same magnitude from Mr. Stabler, who had purchased the property from Mr. McMahan. Mr. Stabler, being made aware of the Consulting Agreement Councilman Howard had with Mr. McMahan, exposed its existence and told a reporter at the *Atlanta Constitution* his version of Councilman Howard's revelations.

Counsel for the defense contends that Mr. Howard is entitled to a new trial because:

(1) the Court invaded the province of the jury when it ruled, as a matter of law, that the Resurgens payments were reportable in 1982;

(2) the Court's charge to the jury was unfair and confusing, failed to properly state the law and the defendant's contentions, was materially misleading and served to deprive the defendant of his constitutional right to a trial by jury;

(3) evidence of a possible ethical violation by Mr. Howard should have been excluded or, at least, limited; and

(4) substantial error was committed when the Court excluded the defense's expert evidence concerning the reportability of the payments on Mr. Howard's tax returns.

In the alternative, counsel argues that Mr. Howard should be acquitted because:

(1) he was entitled to defer reporting his income from the Contract;

(2) the law in this area was sufficiently unclear that it could not have formed the basis of a criminal violation; and

(3) Mr. Howard's tax returns could not have been false at the time they were filed because the "long-term contract" had not yet been completed; therefore, the ultimate services that Mr. Howard would provide under the Contract could not be determined until sometime after 1982.

■ The defense contends that the Court encroached upon the jury's domain when it ruled, as a matter of law, that the Resurgens payments were reportable in 1982 and so informed the jury.[3] The defense argues that, by so doing, the Court directed a verdict against the defendant on the element of "falsity" in violation of the principle of law articulated in *United States v. Goetz*, 746 F.2d 705 (11th Cir.1984).

In *Goetz*, two defendants were each convicted of two counts of willful failure to file federal income tax returns in violation of 26 U.S.C. § 7203. In order to prove a violation of this statute, the government had to prove (1) that the taxpayer was required to file an income tax return; (2) that the taxpayer failed to file such return; and (3) that the violation was willful. For the years 1977 and 1978, the defendants submitted to the Internal Revenue Service tax forms which contained only the words "object self incrimination" in each space requesting income information. The trial court ruled correctly that, as a matter of law, alleged tax returns which do not contain any financial information are not "returns" within the meaning of section 7203. The trial court, however, was not content solely to instruct the jury that, as a matter of law, tax returns which do not contain any financial information are not "returns" within the meaning of the applicable section; the trial court went on to evaluate the documents filed by the defendants and to instruct the jury that, as a matter of law, they were not "returns." By so doing, the *Goetz* court held that the trial court invaded the province of the jury by, "[i]n essence, ... direct[ing] a verdict as to one of the three elements of the alleged offense: failure to file a return." 746 F.2d at 708.

The *Goetz* court stated emphatically that, [t]he rule is firmly established that the trial judge cannot direct a verdict in favor of the government for all *or even one element* of a crime.... The ratio-

nale behind this rule is respect for, and adherence to, the jury system.... There is no reason to deny the defendant the right to a jury determination when the evidence seems overwhelmingly in favor of the government.

746 F.2d at 708 (emphasis added). Additionally, although some appellate courts apply the harmless error rule to situations in which a trial court applied the facts of a particular case to the law, the *Goetz* court rejected this approach and concluded that, "a trial court's actions in directing a verdict in a criminal trial, either in whole or in part, cannot be viewed as harmless error." 746 F.2d at 709.

The *Goetz* court distinguished the case before it from the case of *United States v. Grote*, 632 F.2d 387 (5th Cir.1980), *cert. denied*, 454 U.S. 819, 102 S.Ct. 98, 70 L.Ed.2d 88 (1981). In *Grote*, the trial judge instructed the jury that a taxpayer's return which does not contain any financial information is not a "return" within the meaning of the Internal Revenue Code. The district court did not, however, instruct the jury that the forms in question were not "returns." The appellate court upheld the challenged instruction because it observed that the trial judge had not attempted to impermissibly apply the facts in that case to the law. "The implication of [the *Grote*] holding is that the charge was proper precisely because it merely stated the law and left the factfinding to the jury." *Goetz*, 746 F.2d at 709.

The Court does not believe that its charge violates the principle enunciated in *Goetz*. As is further discussed below, the Court believes that its charge that the income Councilman Howard received from Mr. McMahan in 1982 was reportable in that year was one of law, a matter always for the Court, and not of fact, a matter always for the jury in a criminal case. As in *Grote*, the Court merely stated the law

---

3. Specifically, the Court instructed the jury that, [t]he Court has held and now holds as a matter of law that the income which the defendant received, the $118,000, was reportable and should have been reported under the law in the year 1982, and that is so even though

there is no issue made with respect to the house improvements, and the Court has made no finding with respect thereto; but I do tell you as a matter of law that the Court has found under the evidence in the case the $118,000 should have been reported.

to the jury, that the income that the defendant received from Mr. McMahan was reportable in 1982. The factual question, constituting the element of "falsity," of whether Councilman Howard *actually* reported such income in the proper amount was left, as it must be, to the jury. The jury found that the defendant did not report this income and that, as a result, his return was "false" within the meaning of 26 U.S.C. § 7206(1).

The defendant maintains that the Court erred when it instructed the jury that the income Mr. Howard received from Mr. McMahan was reportable in 1982. The defendant contends that there was evidence in the record which would support a finding that the payments which Mr. McMahan gave to Mr. Howard were actually only loans and, hence, not reportable.

First, there is no evidence in the record to support a finding that the payments from Mr. McMahan to Mr. Howard were loans. Defense counsel relies upon the testimony of Mr. McMahan; however, Mr. McMahan made clear that these so-called "advances" to Councilman Howard were for services to be performed pursuant to their Consulting Agreement. Furthermore, there is nothing in the Consulting Agreement itself setting forth any obligation by Mr. Howard to repay the money to Mr. McMahan. Advances that compensate for services to be performed in the future are income when received. *See Schlude v. Commissioner*, 372 U.S. 128, 83 S.Ct. 601, 9 L.Ed.2d 633 (1963). This is so even though there is a possibility that some of this income may have to be repaid because the services are not rendered later on. It is only when these services are not rendered that a debtor-creditor relationship between the parties comes into existence. *See Anson Beaver*, 55 T.C. 85 (1970). Had this been a debtor-creditor relationship, Mr. McMahan would have testified, in essence, that he necessarily expected Councilman Howard to repay the money that he had given to him. However, Mr. McMahan testified quite clearly that he did not expect to be repaid; in fact, Mr. McMahan acknowledged that if Mr. Howard performed his obligations under the Contract, Mr. McMahan would be indebted to Mr. Howard, not vice versa. While Mr. McMahan did state that he thought that he could sue to recover the payments if Mr. Howard did not complete his obligations under the Contract, the possibility that Mr. McMahan might successfully be able to recover this money does not mean that a debtor-creditor relationship existed at the time the money was advanced to Mr. Howard. While it is generally true that the question of whether a debtor-creditor relationship is created at the time an advance is made is a question of fact for the jury to resolve, where the facts are undisputed, the question of whether "advances" to a taxpayer constitute loans or taxable income is a question of law for the court. *See Alterman Foods, Inc. v. United States*, 505 F.2d 873 (5th Cir.1974); *Tyler v. Tomlinson*, 414 F.2d 844 (5th Cir.1969); *Berkowitz v. United States*, 411 F.2d 818 (5th Cir.1969).

Further, it is clear from the verdict that the jury did not believe that Mr. Howard thought that the "advances" he received might have to be repaid. On the element of "willfulness," the Court instructed the jury that, on the basis of all of the evidence, if they found that Mr. Howard believed that the money that he received from Mr. McMahan in 1982 was "some sort of a refundable advance," they should acquit him. The Court also instructed the jury that the government had the burden of proving the element of "willfulness" beyond a reasonable doubt. Hence, subsumed in the guilty verdict was a rejection by the jury of any notion that Mr. Howard thought that these payments might have to be repaid or were otherwise refundable.

The defendant further contends that the Court erred when it instructed the jury that the income Mr. Howard received from Mr. McMahan was reportable in 1982 because there is evidence in the record to support a finding that Mr. Howard could properly defer reporting this income. This contention also serves as one of the bases for the defendant's motion for acquittal. Integrally connected with this argument is the contention that the Court erred when it excluded the defense's expert evidence con-

cerning the reportability of the payments on Mr. Howard's tax returns. As support for these arguments, the defendant relies primarily upon *United States v. Critzer*, 498 F.2d 1160 (4th Cir.1974), and *United States v. Garber*, 607 F.2d 92 (5th Cir.1979) (en banc). Because of the logical nexus among these arguments, the Court will consider them together.

In *Critzer*, the defendant, an Eastern Cherokee Indian, had been found guilty of willfully attempting to evade and defeat federal income taxes in violation of 26 U.S.C. § 7201 with respect to income earned from improvements located on land in which she had a possessory interest and which were within the Eastern Cherokee Reservation. This land was held in trust for these indians by the United States pursuant to 25 U.S.C. § 331 and the Act of June 4, 1924, c. 253, 43 Stat. 376. The record contained ample support for the conclusion that the underreporting was intentional; however, the issue of the taxability of the income was very much in dispute. It seems that, notwithstanding the government's opinion at the time of trial that Ms. Critzer's business and rental income was taxable, on two prior occasions the defendant was advised by the local superintendent of the Bureau of Indian Affairs that, based on his reading of section 21 of the 1924 Act,[4] the income she derived from her possessory interest in the property was not taxable. Indeed, at the time of the *Critzer* appeal, the Department of Interior, acting in its capacity as trustee for the Eastern Cherokee Indians, indicated that it still believed that the defendant's income was not taxable.

Under these circumstances, the *Critzer* court, without deciding the issue of whether the omitted income was taxable, held that Ms. Critzer,

> must be exonerated from the charges lodged against her. As a matter of law,

defendant cannot be guilty of willfully evading and defeating income taxes on income, the taxability of which is so uncertain that even co-ordinate branches of the United States Government plausibly reach directly opposing conclusions. As a matter of law, the requisite intent to evade and defeat income taxes is missing. The obligation to pay is so problematical that defendant's actual intent is irrelevant. Even if she had consulted the law and sought to guide herself accordingly, she could have had no certainty as to what the law required.

498 F.2d at 1162. In general, the *Critzer* court concluded that, "pioneering interpretations of the tax law should not be sought or rendered in criminal prosecutions ..., but rather in civil suits." 498 F.2d at 1163.

This Court views *Critzer* as a case involving the application the void-for-vagueness doctrine. That doctrine is founded on the principles of due process. Due process requires that the language of a criminal statute convey a "sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices." *Jordan v. De-George*, 341 U.S. 223, 231–32, 71 S.Ct. 703, 708, 95 L.Ed. 886 (1951). The doctrine imposes an obligation on the government to give citizens fair notice of what constitutes punishable conduct and helps guard against arbitrary, unfair, or politically-motivated law enforcement. The test to apply when a vagueness defense is raised is whether the statute involved gave the defendant constructive notice that the challenged conduct was prohibited, and gave the criminal justice system an ascertainable standard by which to determine the defendant's guilt.[5] *See, United States v. L. Cohen Grocery Co.*, 255 U.S. 81, 89, 41 S.Ct. 298, 300, 65 L.Ed. 516 (1921). If the law in question fails to satisfy this twofold test, the void-for-vagueness doctrine mandates

---

4. Section 21 of the 1924 Act provided, in pertinent part, that,

> all restricted allotments and undivided property shall be exempt from taxation until the restrictions on the alienation of such allotments are removed or the title of the band to such undivided property is extinguished.

5. Legal vagueness can be established by either a public dispute or a dearth of authority in the face of a highly debatable issue. *Garber*, 607 F.2d at 99. The Court finds neither in this case.

that the defendant be acquitted, regardless of the facts of the particular case, including the defendant's state of mind. This reading of *Critzer* finds support in the opinion itself. Although the *Critzer* opinion was written in terms of willfulness, the court stated repeatedly that the defendant could not be convicted as a "matter of law" because the government had not defined the proscribed conduct with sufficient clarity. In reaching this conclusion, the court stated that the defendant's actual intent was "irrelevant." 498 F.2d at 1162.

The defendant's argument in his motion for acquittal is, essentially, that, given the availability of the completed contract method of accounting, he could not, as a matter of law, ascertain with any certainty whether the law required him to report the $118,400 he received from Mr. McMahan in 1982 or in some later year. Hence, the defendant argues that it is highly debatable whether Mr. Howard's 1982 tax return was, in fact, "false." The government's response is that, as a matter of law, the completed contract method of accounting was clearly unavailable to Mr. Howard and that, as a result, Mr. Howard's failure to report this income in 1982 unequivocally rendered his tax returns, both the original and as amended, "false."

The Court rejects the defendant's argument. First, the government's main theory at trial was that Mr. Howard's Consulting Agreement with Mr. McMahan was a sham contract. The government was entitled to present this theory to the jury. Clearly, if the Contract was a sham to conceal what were, in reality, bribe payments, Mr. Howard would not be able to take advantage of the completed contract method of accounting. Second, assuming, arguendo, the legitimacy of the Consulting Agreement, the Court does not believe that the issue of the availability or unavailability of the completed contract method of accounting was so "vague" that Mr. Howard could not, as a matter of law, determine whether the con-

duct in which he was engaged was proscribed.

The completed contract method of accounting is a legitimate method of accounting available to a taxpayer who is reporting gross income earned pursuant to a "long-term contract." This method allows most taxpayers [6] who derive income from a long-term contract to report the income earned from this contract and to deduct the costs properly allocable to this contract in the year in which the contract is completed. It is clear, however, that, "[t]he use of the long-term contract method is limited to accounting for income and expenses attributable to long-term contracts. Thus, if a contractor [or any other taxpayer] earns income from other sources, such as investments, this income must be reported under an appropriate non-long-term contract method." BNA Tax Management Portfolio 75–4th at A–19.

Mr. Howard argues that he was a subcontractor on the Resurgens Plaza development project and that the Consulting Agreement that he had with Mr. McMahan was, arguably, a long-term contract as that term is defined in the applicable tax regulation. Howard further maintains that, under Regulation 1.451–3(b)(2), since his work on the Resurgens Plaza construction project was not completed in 1982, he rightfully did not have to report the $118,400 he received in that year until a later year, specifically, the year in which his work on the project was completed and accepted by Mr. McMahan.

A "long-term contract" is defined in Regulation 1.4513(b)(1)(i) as "a building, installation, construction or manufacturing contract which is not completed within the taxable year in which it is entered into." [7] The Court found that the Consulting Agreement was not a "long-term contract" within the meaning of the IRS regulations.

The Contract, labelled "Consulting Agreement" rather than "Construction Contract," states explicitly that it is the

---

**6.** The exceptions to this general rule are not applicable to this case.

**7.** The exceptions to this definition contained in Regulation 1.451–3(b)(1)(ii) are not applicable to this case.

developer, Mr. McMahan, who would do the construction work while Mr. Howard would render "personal services" for Mr. McMahan. Mr. Howard's role on the project would be limited to "perform[ing] consulting services to, for and on behalf of Developer in connection with" the Resurgens Plaza project. The services which Mr. Howard was to provide related to his areas of "expertise, to wit, community relations, governmental relations, and minority contractor participation". When it came to actual construction-oriented work, Mr. McMahan, the other party to the Contract, testified that he considered Councilman Howard a "layman." Far from characterizing Mr. Howard as a subcontractor, Mr. McMahan, while admitting that Mr. Howard was not a licensed broker, likened Mr. Howard to a real estate broker, a person who presented Mr. McMahan with an opportunity and who would be paid if that opportunity bore fruit. Other witnesses testified that Councilman Howard had mentioned to them that he had been retained by Mr. McMahan to help him locate qualified minority subcontractors; however, nobody testified that Mr. Howard had mentioned anything about serving in the capacity of a subcontractor himself.

Besides the fact that "consulting contracts" are not included in the definition of the term "long-term contract" as that term is defined in the applicable regulation, consistently-applied revenue rulings indicate that taxpayers who earn income pursuant to personal services contracts, such as the Consulting Agreement in this case, may not utilize the completed contract method of accounting. This is the case even though the services that the taxpayer performs may be "functionally-related to activities which may be the subject of long-term contracts...." Rev.Rul. 80–18. The rationale behind these rulings is that building, installation, and construction contractors suffer from the unpredictability of fluctuating costs such that "it is impossible for any [such] contractor, no matter how carefully he may estimate, to tell with any certainty whether he has derived a gain or sustained a loss until a particular contract is completed." Rev.Rul. 70–67; Rev.Rul.

80–18. Revenue Ruling 82–134 further advises taxpayers that,

[a] general contractor is responsible for the final product and must correct any mistakes. This responsibility entails control over every element of the contract, not only as to results but also as to the details and means by which the result is achieved. [citations omitted] These are the types of responsibilities required in order to use the completed contract method.

In addition to the revenue rulings, well-recognized tax authorities state that taxpayers who derive income from personal services may not use the completed contract method of accounting. *See Mertens Law of Federal Income Taxation,* § 12.132 (1982); Rabkin and Johnson, *Federal Income, Gift and Estate Taxation,* § 12.-17[1] (1986).

 Defense counsel reminds the Court that revenue rulings do not have the force of law. *See, e.g., Stubbs, Overbeck & Associates v. United States,* 445 F.2d 1142 (5th Cir.1971). Counsel also cites the cases of *Shelley v. Commissioner,* 2 T.C. 62 (1943), and *Loftin and Woodard, Inc. v. United States,* 577 F.2d 1206 (5th Cir.1978), for the proposition that the question of whether taxpayers such as Mr. Howard could utilize the completed contract method of accounting is "vague" or, at least, "problematical."

Regarding the revenue rulings, although revenue rulings are not binding on courts, even the defendant's proffered tax expert acknowledged that accountants use revenue rulings as "guidance" when interpreting tax laws. In this case, the revenue rulings are unambiguous on the point that taxpayers who perform only personal services, even though those services may be functionally-related to a construction project, and who, unlike a general contractor, are not responsible for the final product to which their services relate cannot take advantage of the long-term contract method of accounting. The interpretations contained in these rulings are entirely consistent with the definition of a "long-term contract" contained in Regulation

1.4513(b)(1)(i), a definition which does not include consulting agreements.

The *Shelley* case involved an engineering firm, the Pershell Engineering Co., which designed, engineered, and supervised the construction of oil refinery plants and equipment. Pershell was an accrual basis taxpayer which used the completed and accepted contract basis for reporting income from long-term contracts. Pershell was the transferee of a "master contract" that had been entered into by the Winkler-Koch Engineering Co. and A.F. Craig & Co., Ltd. The transfer obligated Pershell to assume the duties and obligations of Winkler-Koch under the master contract. Prior to this transfer, Craig, a fabricator and erector of oil refinery equipment, entered into a contract with a Roumanian concern to design, engineer, and construct a cracking and coking unit or plant in Roumania. Pursuant to the master contract, Craig and Winkler-Koch, and, later, Pershell, began to design, engineer, and construct this plant in 1936. The plant was not completed until 1938. Under the terms of the contract which Craig had with the Roumanian concern, the Roumanian company was not liable to pay the contract price until the refinery had been completed and operations had successfully met certain prescribed conditions following a 15–day test run. Once, Craig was paid, Winkler-Koch would be paid pursuant to the master contract; at which point, Winkler-Koch would pay Pershell pursuant to the transfer of the master contract. A couple of days before the successful completion of the test run at the Roumanian plant, all six stockholders of Pershell convened an emergency meeting and dissolved Pershell. These stockholders contended that the income which was received from Winkler-Koch shortly after the alleged dissolution of Pershell was not income of Pershell but was income only of the stockholders. The sole issue before the tax court was whether Pershell had to pay income taxes on the profits it received in 1938 from the completion and acceptance of the oil refinery in Roumania. The tax court held that, since

Pershell kept its books and records on an accrual basis, Pershell had to pay taxes on the income it received from the Roumanian contract. The tax court did not address in any way the question of whether Pershell was entitled to use the completed contract method of accounting. The issue of the propriety of using this method was never raised presumably because there was no evidence that Pershell received any income until 1938. Had Pershell actually received, or, as an accrual basis taxpayer, had a right to receive, any payments before that year and sought to defer reporting such income, the issue might have been raised by the Commissioner. But, such was not the case. As well, although the completed contract issue was never raised in *Shelley*, this Court notes that the taxpayer in *Shelley* had a far more supportable position for utilizing this method of accounting than does Mr. Howard. Pursuant to the master contract, Pershell was obligated to supervise the construction of the Roumanian plant. It is equally clear that, until the Roumanian contract was completed and accepted, there was a distinct possibility that Pershell would sustain a heavy loss as a result of its participation in the project. *Shelley*, 2 T.C. at 68 ("Pershell was not entitled to receive any income whatever from the Roumanian job until after the 15–day continuous test run had shown that the plant when completed would meet the guarantees made with respect to its performance; that if it had not met those guarantees Pershell would have been indebted to Craig to the extent of double the payment due [Winkler-Koch] from the job for failure of the equipment or installation to meet the guarantees."). Under the Consulting Agreement, Mr. Howard was not obligated to supervise any construction work, much less perform any himself. Additionally, assuming the validity of the Consulting Agreement, while it may not have been clear to Councilman Howard how much profit he was ultimately going to make, there was never a possibility that he would sustain a loss.[8]

**8.** The Court notes that in *Sam W. Emerson Company v. C.I.R.*, 37 T.C. 1063 (1962), the tax court gave its imprimatur to the use of the completed contract method of accounting by a

The *Loftin* case involved the issue of whether the shareholders of a closely-held corporation received a constructive dividend from the corporation. The corporation had agreed to repair several structures already on some land, to clear the boundary lines on the land, to establish some drainage facilities, and, eventually, to clear the land. 577 F.2d at 1212. The evidence at trial established that the land clearing operation would take several years, and that the corporation would not be reimbursed until the end of the land clearing project. The district court found, inter alia, that a constructive dividend had accrued to the shareholders. The appellate court remanded the case to the district court because, inter alia, it was unclear whether the trial court employed the correct legal standard in its determination that a constructive dividend had been conferred upon the shareholders. In its remand, the appellate court directed the trial court to re-evaluate its decision to utilize a calendar year period for the measurement of the amount of the constructive dividend. Without expressing any opinion as to how the district court should ultimately resolve the issue, the Fifth Circuit suggested that, under the circumstances of that case, an application of the annual accounting method to compute the tax liability of the shareholders and the corporation might not "clearly reflect income" as that phrase is used in 26 U.S.C. § 446(b), while an application of the completed contract approach might. On this issue, the appellate court stated that, in general,

> [t]he completed contract method or a comparable cumulative approach, is best suited for a transaction spanning several years where payment is not expected concurrent with the accrual of costs and the constructive receipt of income by the taxpayer is established on the basis of the accounting scheme chosen by the corporate entity." [9]

The Court finds significant the fact that this statement regarding the potential applicability of the completed contract method of accounting is premised, as are the revenue rulings discussed above, on the existence of unpredictable, fluctuating costs, similar to those faced by a general contractor, associated with a multi-year project involving physical activity analogous to the type of activity performed by a general contractor. On the record before this Court, on the other hand, there is no evidence that Mr. Howard bore any of risks similar to those of a general contractor. Unlike the corporate taxpayer in *Loftin*, Mr. Howard was not in any way responsible for the final product and could not be held liable for defects in the final product; and, unlike the individual taxpayers in *Loftin*, Mr. Howard had no construction-related costs to incur.

The only unknown variable to Mr. Howard in 1982, assuming that the Contract was not a sham agreement, was whether he was going to receive the full amount stated in Contract. This variable was wholly dependent upon whether the Resurgens Plaza project sold for more or less than a million dollars profit to Mr. McMahan. However, the law is clear that, under these circumstances, a taxpayer, such as Mr. Howard, who performs only personal services associated with a sale of a real estate project and who does not build, construct, or install anything or incur any construction-related costs or face any liability

construction company whose long-term contracts were all "cost-plus" contracts. Under those circumstances, it was unlikely that the taxpayer was ultimately going to sustain a loss. However, in addition to the fact that the contracts involved were true construction contracts, hence, clearly within the definition of a "long-term contract," the tax court noted that, "each of petitioner's cost-plus contracts was an integral indivisible unit. Furthermore, because petitioner was potentially liable under the contracts for acts of negligence resulting from its work or for incorrect performance, its overall actual profit was not definitely ascertainable

until the contract was completed and accepted." 37 T.C. at 1068–69. Indeed, because the taxpayer was responsible, and potentially liable, for the ultimate product, there was the possibility, however slight, that the taxpayer might, in fact, sustain a loss.

9. It is worth noting that corporation in the *Loftin* case did not account for the underlying transactions on a completed contract basis despite the obvious tax advantages it would have gained by so doing. 577 F.2d at 1232 n. 57.

for defects in the venture cannot utilize the long-term contract method of accounting. *See Wood v. Commissioner,* 245 F.2d 888, 892 (5th Cir.1957); *United States v. Wilkins,* 385 F.2d 465, 469 (4th Cir.1967). The Court rejects the defendant's argument that the law regarding the long-term contract method of accounting is sufficiently vague to warrant an acquittal in this case.[10]

The defendant contends that this Court erred when it refused to permit its expert, Mr. Edward Upchurch, to testify before the jury. The defendant cites *United States v. Garber,* 607 F.2d 92 (5th Cir.1979) (en banc), to support this argument. In *Garber,*[11] the defendant was convicted of willfully and knowingly attempting to evade a portion of her income tax liability in violation of 26 U.S.C. § 7201. For the tax years in question, Ms. Garber sold some of her rare blood plasma to various laboratories but did not report the income derived from these sales.[12] Unlike virtually every other blood donor in this country, however, Ms. Garber was not paid on the basis of work done, pain incurred, or time spent producing one pint of plasma; rather, because of the incomparable nature of her blood, the amount she was paid related solely to the degree of concentration of the desired antibodies found in her plasma.

At trial, outside the presence of the jury, the government proffered the testimony of its tax expert. Although he admitted that this case was the first of its kind, the government's expert likened the transactions in question to the sale of a product for which there was no tax basis (i.e., no original cost). Alternatively, he analogized the transactions to the rendition of services. Given either scenario, he concluded, based on section 61(a) of the Internal Revenue Code,[13] that the money was fully taxable.

The defense offered its own expert who maintained that the money that Ms. Garber had received did not fit within the legal definition of income as defined in section 61(a). He likened the transactions in question to a series of tax free exchanges of capital assets for funds, the funds being only the actual value of the assets. He based his conclusion on some early caselaw in which the human body was considered a type of capital asset. His theory was that the exchange of the rare blood plasma, like property settlements in divorce actions and damage awards in defamation actions, involved the exchange of something so personal that its value could not be accurately measured. Therefore, he postulated, the blood plasma must have been worth its

**10.** The defendant also argues that his motion for acquittal as to Count One should be granted because at the time he filed his original 1982 tax return, there was still a possibility that in the future he might engage in some actual construction and, hence, could properly utilize the completed contract method of accounting. Suffice it to say that the Consulting Agreement states that Mr. Howard would perform consulting services "in connection with" the construction of the project but mentions nothing about the possibility that Mr. Howard would actually construct anything. Nor was there any evidence introduced that either Mr. Howard or Mr. McMahan ever contemplated that there was a possibility that Councilman Howard would engage in any construction with respect to the Resurgens Plaza Project.

**11.** Although *Garber* is binding precedent on this Court, the Court notes that *Garber* has been criticized both by other courts and in scholarly literature. *See, e.g., United States v. Ingredient Technology Corp.,* 698 F.2d 88, 97 (2d Cir.1983); *United States v. Curtis,* 782 F.2d 593, 599 (6th

Cir.1986); *United States v. Mallas,* 762 F.2d 361, 364 n. 4 (4th Cir.1985). *See also* Note, Criminal Liability for Willful Evasion of an Uncertain Tax, 81 Colum.L.Rev. 1348 (1981).

**12.** Ms. Garber had been told several years earlier that her blood contained a rare antibody useful in the production of blood group typing serum. Apparently, Ms. Garber was one of only two or three known persons in the world whose blood contained this antibody. Although the technique used to extract the blood and separate the plasma was painful and also increased the risks of hepatitis and blood clotting, Ms. Garber was paid handsomely for her efforts; she allegedly earned $80,200 in 1970, $71,400 in 1971, and $87,200 in 1972 for selling her plasma.

**13.** 26 U.S.C. § 61(a) defines gross income as: all income from whatever source derived, including (but not limited to) the following items:
(1) Compensation for services, including fees, commissions, and similar items;
. . . .

market value and that its exchange produced no taxable gain.

The trial judge did not admit either opinion into evidence because he considered the taxability question to be one of law. The trial judge did, however, permit a government expert to testify, over defense objection, that the compensation that the defendant had received was taxable and had not been reported. During cross examination, counsel for the defense elicited from the government's witness that the taxability of money received for the sacrifice of a part of one's body was a unique and unresolved question of law.

The defense argued to the court that it should be permitted to present the testimony of its expert to the jury, "to rebut the government's expert IRS agent, to show that doubt existed as to whether a tax was due because it was incapable of being computed, and to demonstrate the vagueness of the law, which would preclude a willful intent to violate it." 607 F.2d at 96. The trial judge recognized the relevancy of the testimony to a judicial resolution of the legal question; however, because there was no evidence that this expert had ever discussed his legal opinion with Ms. Garber, he held that the testimony had no relevancy to the factual question of the defendant's intent. Accordingly, he did not permit the jury to hear the testimony.

At the conclusion of the trial, the judge ruled as a matter of law, and so instructed the jury, that the income Ms. Garber had received for her blood plasma was reportable. The court also instructed the jury on the issues of good faith and willfulness but refused to give an instruction to the effect that a misunderstanding by the defendant as to her liability is a valid defense to the charge of tax evasion. The jury found Ms. Garber guilty; however, the court of appeals held, in an opinion written by Judge Charles Clark, "that the combined effect of the trial court's evidentiary rulings excluding defendant's proffered expert testimony and its requested jury charge prejudicially deprived the defendant of a valid theory of her defense." 607 F.2d at 97. The appellate court, without deciding the question of the reportability of the "income" in question, reversed and remanded for retrial.

In so doing, the *Garber* court stated that,

[w]hen the taxability of unreported income is problematical as a matter of law, the unresolved nature of the law is relevant to show that defendant may not have been aware of a tax liability or may have simply made an error in judgment. [citations omitted] Furthermore, the relevance of a dispute in the law does not depend on whether the defendant actually knew of the conflict. ... To hold otherwise would advocate convicting an unsophisticated taxpayer who failed to seek expert advice as to whether certain income was taxable while setting free a wise taxpayer who could find advice that taxes were not due on the identical type of debatably taxable income.

607 F.2d at 98.

The *Garber* court observed that the taxability question before it involved "an unchartered area in tax law," 607 F.2d at 99, and that each side's position on the issue, while not frivolous, was not supported by any clear precedent. Additionally, the court stressed that Ms. Garber had testified that she subjectively thought that the money she had received from the sale of a part of her body was not taxable. In light of her testimony and the "problematical" nature of the question involved and in light of the fact that the element of "willfulness" was critical to her defense, the *Garber* court held that the trial court erred by disallowing the testimony of the defendant's expert. By doing so, the trial judge "deprived the defendant of evidence showing her state of mind to be reasonable." 607 F.2d at 99.

After ruling that the trial court erred when it refused to admit the testimony of the defendant's tax expert, Judge Clark stated:

[t]his error was compounded by the court's instructions to the jury which took from them the question of the validity of the tax. In effect, the court adopted the government's position that a tax was owing as a matter of law....

[T]he defense in this case rested entirely on a denial of the necessary criminal intent to evade taxes. The court erred by refusing to instruct the jury that a reasonable misconception of the tax law on her part would negate the necessary intent.

607 F.2d at 99. It is unclear from this passage whether the trial court erred when it instructed the jury that, as a matter of law, Ms. Garber's income was reportable or whether the court's error was in its refusal to permit the defendant's expert to testify before the jury and in its refusal to give the requested instruction. Since this Court believes that the taxability of "income" in this case, if not always, is a legal question, as opposed to the factual issue of intent, the Court is persuaded by Judge Hill's reading of the majority opinion that, in light of the "novel question" presented, "the defendant should have been permitted to demonstrate its novelty, not so that the jury could pass upon the tax consequences of the transactions, but so that the jurors could better determine the question of willfulness." 607 F.2d at 100 (Hill, J., concurring).

The Court is not convinced by the defendant's argument that, on the basis of *Garber*, the Court erred by refusing to permit the defendant's expert to testify before the jury. This Court does not read the *Garber* opinion in the broad manner suggested by the defense. The *Garber* Court was faced with a situation in which the tax question involved was "problematical as a matter of law," a standard which this Court interprets to mean approaching, but perhaps not quite reaching, that legal vagueness mandating acquittal, and in which there was direct evidence in the record of the taxpayer's subjective belief that the money she had earned was not taxable. Under these circumstances, the *Garber* Court held that the trial court erred by not admitting the defendant's proffered expert testimony because, even though she might not have been aware of the problematical nature of the tax question involved, such evidence was relevant to show that the defendant's actual state of mind was reasonable. Although the *Garber* court was silent as to the basis for this ruling, the likely rationale is that, if supposed experts are sufficiently confused as to the proper resolution of a particular tax question, the taxpayer should be entitled to present evidence of this confusion to the jury in order to bolster the credibility of her argument that the approach she took and subjectively believed was correct was, at least, reasonable.[14]

The Court reads the *Garber* holding to mean that it would have been required to admit the proffered testimony only *if* the Court deemed the resolution of tax question involved to be problematical as a matter of law *and if* there was some evidence in the record of the defendant's subjective belief that the money he received from Mr. McMahan was not reportable in 1982. For the reasons stated above,

**14.** Other than possibly to bolster the credibility of evidence of a taxpayer's subjective intent not to violate the tax laws, evidence of legal uncertainty is irrelevant to the factual question of willfulness. As one commentator has noted, a defendant can willfully violate the law regardless of the certainty or uncertainty of its interpretation. The law might very clearly tax specified receipts, yet a defendant might be able to prove that he honestly believed the receipts were nontaxable, and therefore that he did not act willfully. Whether the defendant's beliefs about the legality of his actions were right or wrong, reasonable or unreasonable, [footnote omitted] is irrelevant to willfulness; the only issue is whether those beliefs were in fact held. [footnote omitted] Likewise, the Government could satisfy the willfulness element of a tax evasion prosecution by showing that the defendant believed that certain receipts were taxable, even if they were unquestionably not taxable. The fact that the taxpayer's belief happened to be wrong would not affect the taxpayer's "willful" state of mind, but would justify an acquittal for lack of a tax deficiency instead. [footnote omitted]

Note, Criminal Liability, supra note 11, at 1356. In addition to these two scenarios, a taxpayer can willfully or not willfully intend to violate a dubious tax assessment. If the tax question is sufficiently dubious, as in *Critzer*, an acquittal would be justified as a matter of law on the basis of the vagueness of the state of the law regardless of the taxpayer's actual intent.

the Court holds that the tax question involved in this case is not problematical as a matter of law. As well, the Court has searched in vain for any evidence in the record that Mr. Howard subjectively believed that he could defer reporting the income he received from Mr. McMahan in 1982.[15] Under these circumstances, the Court finds that any probative value to the proffered testimony was far outweighed by its potential for confusion. *See United States v. Burton,* 737 F.2d 439, 443–44 (5th Cir.1984); *United States v. Daly,* 756 F.2d 1076, 1083 (5th Cir.1985).

▮▮▮▮ The defendant maintains that the Court should have allowed Mr. Upchurch to testify as an impeachment witness to rebut the testimony of Mr. Ralph Williams, the government's expert witness. However, the Court finds that the defense did not proffer any legitimate impeachment evidence. Mr. Williams testified that the payments to Mr. Howard in 1982 were reportable in that year because Mr. Howard was a cash basis taxpayer. The evidence was undisputed that Mr. Howard was a cash basis taxpayer, and the Court ruled, as a matter of law, that the 1982 payments were reportable. As the Court has already stated, the Court does not believe that the defense established the factual or legal predicate necessary to challenge Mr. Williams' testimony on reportability. Contrary to the defendant's contentions, Mr. Williams did not testify that a cash basis taxpayer such as Mr. Howard had to obtain permission from the IRS before using the completed contract method. Mr. Williams testified that a cash basis taxpayer must obtain permission from the IRS before switching to the accrual method of accounting. Regarding the completed contract method, Mr. Williams testified that, assuming he qualifies to use the completed contract method, a taxpayer need only "elect" to use it and defer reporting the income. The defense did not proffer any evidence to the contrary. Finally, the defendant argues that, because the government conceded that it was lawful for Mr. Howard to omit the house remodeling payments on his 1982 tax returns, Mr. Upchurch should have been allowed to explain to the jury that there was no rational basis on which a distinction could be made between the cash payments Mr. Howard received and the house remodeling payments. The government conceded nothing of the sort. The government's position in the Amended Bill of Particulars not to charge Mr. Howard with willfully failing to report the house remodeling payments represented a prosecutorial decision, not an opinion on the propriety of accounting choices. Mr. Upchurch's testimony in this regard would have been confusing to the jury and would have been purely argumentative.

▮▮▮ Counsel for the defendant further contends that the defendant is entitled to a new trial because the Court's charge to the jury was both erroneous in several key respects and prejudicial to him. The defendant argues that the Court's instruction on the reportability of the payments was erroneous, gave undue credibility to the government's position, and served to undermine the defendant's argument that he thought that he could defer reporting the Resurgens payments until the project was completed. As the Court has already stated, the Court finds that the reportability issue was a matter of law for the Court

---

**15.** The defendant argues that there is "plenty" of evidence in the record of Mr. Howard's subjective intent. In so doing, the defendant refers the Court to the testimony of Mr. McMahan and of his accountant, Mr. Ellison. However, Mr. McMahan explicitly testified that he never had any discussions with the defendant about how Mr. Howard should report his taxes. Additionally, Mr. Ellison and his assistant testified that the defendant never said anything to them, either before or after they prepared his tax returns, about receiving any consulting income from Mr. McMahan in 1982. The Court further rejects the defendant's argument that the presumption of innocence which every criminal defendant enjoys is evidence of Mr. Howard's subject intent. The presumption of innocence is not evidence of anything much less evidence of what a particular defendant believed. The presumption of innocence speaks solely to the burden of proof which the government must meet before a defendant can be convicted of a crime.

and that it was the Court's duty to instruct the jury on the pertinent law to apply to the facts of this case. The Court does not believe that its instruction on the reportability of the income gave undue credibility to the government's position or undermined the defendant's position. When viewed in the context in which they were given, the Court's references to the reportability of the payments were, if anything, favorable to the defense. These references were made in conjunction with the Court's explanation to the jury that the defendant could not be convicted merely for failing to report the Resurgens payments. The Court stressed several times that the government had to prove beyond a reasonable doubt that the defendant willfully failed to report this income.

■■■■ The defendant further maintains that the Court erroneously instructed the jury on the issue of "willfulness." The defendant argues that the Court erred when it initially failed to instruct the jury that one must act with a "bad purpose" in order to act willfully and that the Court directed a verdict on the element of "willfulness" by instructing the jury that Mr. Howard "knew" that he should have reported more income than he did.[16] Besides the fact that the Court, in its final instruction, told the jury that one must act with a "bad purpose" in order to act willfully, the Court notes that it is not error to omit the words "bad purpose" from an instruction on "willfulness." *See United States v. Wilson*, 550 F.2d 259, 260 (5th Cir.1977); *United States v. Brown*, 548 F.2d 1194, 1199 (5th Cir.1977). As to counsel's second argument, far from instructing the jury

that Mr. Howard "knew" that he underreported his income, when read in context of the entire charge, the Court was merely reminding the jurors that, as they had previously been charged, they could not convict Mr. Howard unless they found that the government had proven beyond a reasonable doubt that Mr. Howard intentionally violated a known legal duty.[17]

The defendant also contends that he is entitled to a new trial because the Court, in its recapitulation, misconstrued defense theories in a manner prejudicial to him. The Court finds this contention meritless. The Court did not "eliminate" any defense theories in its recapitulation. These theories had already been thoroughly and skillfully expounded by counsel in his closing argument. If anything, the Court focused the jury's attention on the theory most stressed by defense counsel, that the defendant honestly believed that the language of the Contract relieved him from the duty of reporting the Resurgens payments in 1982.

■■■■ Finally, the defendant argues that his motion for a new trial should be granted because of the prejudice created by the improper admission of John Stabler's testimony and of evidence of Councilman Howard's zoning activities on Mr. McMahan's behalf. The Court disagrees. It was not until after defense counsel "opened the door" on cross-examination of Mr. McMahan that the Court permitted the government to ask Mr. McMahan about Councilman Howard's zoning activities on his behalf. Through his cross-examination, defense counsel sought to portray the defendant's relationship to Mr. McMahan as pub-

---

16. The language which the defendant challenges is the portion of the charge in which the Court instructed the jury that it must determine "whether or not the defendant willfully underreported his gross income, gross receipts, in 1982, knowing that ... a larger amount was reportable."

17. In this regard, the jury was specifically told that if they found that Mr. Howard was laboring under the mistaken belief that he could defer reporting the Resurgens payments beyond 1982,

they must find that he did not act "willfully" and must acquit him. The defendant argues that the Court's choice of words suggested that the defendant's belief, assuming that he was actually laboring under a misconception, was or would be unreasonable or illogical. Although the Court disagrees with this characterization, the Court notes that it instructed the jury that even a "grossly negligent" belief by the defendant that he did not have to report the payments in 1982 would mandate an acquittal.

lic and aboveboard and to establish that the amendment to their consulting agreement was motivated by a sense of fairness to reward Mr. Howard for his efforts arising solely out of his participation in the Resurgens Plaza Project. Defense counsel also sought to establish that Mr. McMahan seriously considered the possibility of suing Councilman Howard to recover the payments. In the face of this testimony, the government was entitled to ask questions of Mr. McMahan designed to show that Mr. McMahan was not motivated only by a sense of goodwill and that Mr. Howard had every reason to believe that he would be able to retain the money he received from Mr. McMahan while being assured that Mr. McMahan would keep the payments a secret. Along this same vein, Mr. Stabler's testimony was relevant to show how Mr. Howard viewed these payments, since the defendant made explicit references to these payments when he spoke to Stabler. Additionally, Mr. Stabler's testimony was relevant to explain to the jury what triggered the exposure of the defendant's relationship with Mr. McMahan. In short, both Mr. Stabler's testimony and the testimony regarding Mr. Howard's zoning activities were relevant to show the defendant's state of mind about the payments he received from Mr. McMahan and to expose his efforts and his desire to prevent public disclosure of these payments.

In sum, for the foregoing reasons, the defendant's motion for a new trial, or in the alternative, for a judgment of acquittal is DENIED.